EL PUEBLO DE PUERTO RICO, apelado, *v.* JOSÉ HERNÁNDEZ PAGÁN, acusado y apelante.

*Número:* CR-85-63      *Resuelto:* 30 de junio de 1987

*Felipe Cirino Colón*, de la Sociedad para Asistencia Legal, abogado del apelante; *Rafael Ortiz Carrión, Procurador General, Blanca A. Díaz Segarra, Procuradora General Auxiliar*, abogados de El Pueblo.

## SENTENCIA

Se impugnan en apelación los veredictos de culpabilidad por los delitos de asesinato en primer grado, robo, portación y posesión ilegal de armas de fuego. Alega el apelante que el procedimiento de identificación estuvo viciado, cuestiona la convicción en el delito de robo por insuficiencia de la prueba y porque "dicho delito quedó confundido en el asesinato estatutario" (alegato, pág. 31) y, además, cuestiona de forma general la suficiencia de la prueba que conecta al apelante con los delitos imputados. Examinada toda la prueba en el caso de autos, según surge de la exposición narrativa de la prueba, así como la comparecencia de las

partes, confirmamos todas las sentencias dictadas, a excepción de la recaída en el caso de robo. La prueba no fue suficiente para probar más allá de duda razonable que el apelante sustrajo un arma del local asaltado, según surge de la teoría del fiscal.

## I

Las convicciones del apelante estuvieron fundadas en gran medida en el testimonio de Waldemar Albelo Toledo, hijo del occiso. Declaró, en síntesis, que el 24 de noviembre de 1984, a las 12:05 A.M., se encontraba en compañía de su padre en el negocio de cafetería y colmado que éste operaba en el barrio "Cacao" de Quebradillas. Su padre cerraba las puertas del frente cuando llegaron dos individuos y lo encañonaron. El testigo se encontraba arrodillado mientras llenaba una nevera de cervezas en la parte de la cafetería. Su padre resistió y forcejeó con los asaltantes.

Continuó su declaración, que pudo ver a una de las personas "que quedaba directamente hacia él y estaba mirando en dirección a él". E.N.P., pág. 7. Al otro individuo que encañonaba a su padre no lo logró ver porque el testigo se escondió al lado de un aparador y aquél estaba fuera de su alcance. Testificó, sin embargo, que vio a uno de los individuos más o menos de dos a tres minutos. Describió a esa persona como "robusta, blanca trigueña, con bigote y tenía una camiseta de rayas horizontales y pantalón gris". E.N.P., pág. 7. Lo pudo ver porque "estaba claro"; las lámparas fluorescentes estaban encendidas. Añadió que el asaltante tenía una gorra negra y espejuelos claros y que, mientras le apuntaba a su padre, miraba hacia donde él estaba escondido.

Siguió su relato que de "ahí se fueron del alcance de [su] vista hacia la parte del colmado". E.N.P., pág. 8. Cuando dejó de verlos, se paró y sigilosamente abrió un portón de

rejas que daba hacia el patio "por si tenía que escapar". E.N.P., pág. 8. Volvió hacia atrás, fue a la caja registradora en busca del revólver de su padre y no lo encontró por lo que "*supuso* que el occiso lo tenía encima". E.N.P., pág. 8. Su padre tenía licencia para portar armas, un revólver Smith & Wesson calibre 38 que, según relató, no apareció en el lugar de los hechos.

Mientras estaba en la caja registradora, oyó una serie de disparos y corrió hacia la parte de afuera del negocio. Cuando llegó al portón que había abierto originalmente, alguien le gritó "párate ahí"; le dio una patada a la reja y siguió corriendo por el patio. Vio un carro que estaba frente al negocio con las luces encendidas y el motor encendido. Le pareció que era un auto rojo. Luego volvió al negocio y vio que había una gorra con visera tirada en el piso. Llegó a donde estaba su padre y vio que estaba muerto, tirado entre dos góndolas en la parte del colmado.

Volvió a ver al acusado el lunes 26 de noviembre en el cuartel de Arecibo durante la rueda de identificación. Declaró que en dicha rueda había cinco personas. El acusado hacía el número 3. Lo observó y lo reconoció rápidamente, aunque lo examinó por cuatro o cinco minutos pues le indicaron que se tomara su tiempo. Identificó en el juicio a José Hernández Pagán como a una de las personas que encañonó a su padre. Cuando el fiscal le mostró el *exhibit* 5A del Pueblo, el testigo lo identificó como la gorra que vio tirada en el piso del negocio y al mostrarle el fiscal unos espejuelos, dijo que eran los que llevaba puestos el acusado al momento de los hechos.

Como segundo testigo del fiscal declaró Elliut Hernández Pérez, hijo del acusado Hernández Pagán. El Ministerio Público le mostró la gorra que fue encontrada en el lugar de los hechos y la identificó suya "porque le había cosido una tirilla y porque le había puesto el nombre de él en el 'ticket' de la gorra". E.N.P., pág. 2. Algunas veces otras

personas usaban esa gorra en la casa, entre ellas, su papá. El sábado 24 de noviembre de 1984 en horas de la tarde, vio la gorra en una guagua *Mirage* que tenía su padre.

El tercer testigo en declarar por parte del Ministerio Público fue Lilliam Hernández Pérez, hija del acusado. Al mostrársele la gorra dijo reconocerla como la de su hermano. Indicó que además de su hermano todos la usaban en la casa. Declaró que el 24 de noviembre de 1984, por la mañana, notó que su papá estaba herido. Tenía una herida en la rodilla y otra en el hombro. Le preguntó qué le había sucedido, y él le indicó que lo habían agredido en un asalto; su papá no le dijo dónde lo asaltaron y no fue a curarse al hospital.

Otro de los testigos que declaró por el Ministerio Público fue el agente Miguel A. Velázquez. Declaró en lo pertinente que el 25 de noviembre de 1984 recibió una llamada de una mujer a eso de las 3:45 P.M. quien le indicó que en Villa Evangelina de Manatí, y específicamente en la Calle 13 había un señor herido de bala. Según la información, el herido —que luego resultó ser el apelante— indicó que había tenido un problema en el área de Arecibo. El agente se comunicó con el fiscal Pérez Soto y se personó a la urbanización Villa Evangelina. Localizó la casa y pidió hablar con el apelante. Éste accedió. El policía notó que el apelante cojeaba cuando le dio la espalda. El testigo le preguntó qué le había pasado en el hombro. El hoy apelante le manifestó que había salido hacia Bayamón. Primero, había salido hacia la feria de carros de Manatí como a las 11:00 A.M. de 23 de noviembre de 1984 y a las 5:00 P.M. salió para Bayamón al teatro. Después del teatro salió para Levittown, y después de Levittown al regresar por la Carretera 165, en un punto de la autopista se estacionó a la derecha. En eso, se detuvo un vehículo que venía detrás y le hizo dos disparos; luego el vehículo viró en redondo y se fue. Según el apelante, eso ocurrió a las 11:00 P.M. Se

montó en su carro y se fue a visitar a un amigo en Levittown. No encontró al amigo y se fue a visitar a un sobrino en Barceloneta, pero casi al llegar a la casa se acordó de que su sobrino trabajaba de noche.

En esos momentos el sargento procedió a hacerle las advertencias y le pidió que lo acompañara al cuartel. Luego de las advertencias, procedió a preguntarle qué película había visto. El apelante le contestó que el título era en inglés y no quiso entrar. También le preguntó dónde vivía el amigo de Levittown y el apelante le contestó que no sabía porque el "papelito se le había perdido". E.N.P., pág. 16. Le preguntó cómo se llamaba el sobrino y dónde vivía y no le pudo contestar.

Con este trasfondo general de hechos, analicemos los señalamientos del apelante y maticemos, de ser necesario, los aspectos concretos.

## II

Argumenta el apelante que en la rueda de detenidos no se reprodujeron adecuadamente las circunstancias que el testigo Waldemar Albelo Toledo describió a la Policía como las del asaltante. Alega que por lo menos uno de los participantes en la rueda vestía un "mameluco" de los que usualmente usa la Policía; que ninguno de los componentes de la rueda tenía gorra ni *T-shirt* de colores; los espejuelos que le pusieron a los componentes de la rueda no tenían cristales; de los componentes de la rueda de identificación, el más bajito era el acusado; de los componentes, uno tenía pecas en la cara y el bigote rubio y, por último, destaca el apelante que el testigo de defensa Lcdo. Rafael Pérez Abreu declaró que el testigo Waldemar Albelo Toledo, durante el proceso de identificación en el cuartel, se dirigió de forma interrogativa a un agente de la Policía diciéndole: "¿Ése es?", refiriéndose al apelante. E.N.P., pág. 23.

Sobre todos estos extremos hubo prueba conflictiva en el récord.

Con frecuencia hemos expresado que la norma vigente hace depender la confiabilidad de la identificación de la totalidad de las circunstancias, aun cuando el procedimiento de confrontación haya sido sugestivo. Entre los factores a tenerse en cuenta como indicadores para medir la posibilidad de error en la identificación están: (1) la oportunidad que tuvo el testigo de observar al ofensor al tiempo en que cometía el crimen; (2) el grado de atención del testigo; (3) la corrección de la descripción previa del criminal por el testigo; (4) el nivel de certeza demostrado por el testigo en la confrontación, y (5) el tiempo transcurrido entre el crimen y la confrontación. *Pueblo* v. *Calderón Orta*, 110 D.P.R. 833 (1981); *Pueblo* v. *Peterson Pietersz*, 107 D.P.R. 172 (1978).

La clave en la determinación de admisibilidad es la confiabilidad que resulta de una apreciación de la totalidad de las circunstancias; la presencia de sugestión no excluye irremisiblemente la prueba, sino que impone al jurado o al juez constituido en tribunal de derecho la labor de separar campos en el testimonio para determinar su confiabilidad y la existencia de prueba de identificación no influida ni maculada por conducta sugestiva. La conclusión del juzgador de hechos sobre este punto tiene todo el respeto y validez que en apelación se extiende a las determinaciones de hecho. *Pueblo* v. *Suárez Sánchez*, 103 D.P.R. 10, 19, 21-22 (1974); *Pueblo* v. *Peterson Pietersz*, supra; *Pueblo* v. *De Jesús Rivera*, 113 D.P.R. 817, 824 (1983).

Una evaluación integral de la prueba nos convence de que los veredictos descansan en una identificación suficiente del acusado. El testigo Waldemar Albelo Toledo declaró — el jurado creyó su testimonio— que había visto a uno de los individuos que asaltó el negocio de su padre. Que el asaltante que pudo ver tenía una gorra negra puesta y

espejuelos claros. Describió a esa persona como blanca trigueña, pelo negro, de bigote, estatura de 5'8" a 5'10", usaba espejuelos y tenía una camiseta de rayas horizontales y pantalón gris. Dijo que "pudo ver todo esto porque estaba claro"; las lámparas estaban encendidas "en la terraza y en la parte del horno de pizza". E.N.P., pág. 8. El acusado mientras apuntaba a la víctima miraba al testigo. La concentración del testigo en los rasgos del acusado fue buena, según quedó demostrada al identificar al apelante sin vacilación en la rueda de detenidos. Esta misma descripción del asaltante la ofreció el testigo al primer policía en personarse al lugar de los hechos. Luego se la ofreció al fiscal y al sargento Velázquez, quienes fueron más tarde a investigar. Por último, los hechos delictivos en el caso de autos ocurrieron el 24 de noviembre de 1984, la confrontación en la rueda de detenidos se efectuó el 26 de noviembre de 1984, es decir, a los dos días de ocurrir los hechos.

En relación con los señalamientos de sugestividad en el proceso de identificación, un examen de la totalidad de las circunstancias que rodearon la identificación en el presente caso nos convence de que el mismo no estuvo viciado por irregularidades que afectaran derechos sustanciales del apelante y que ameriten que la identificación sea suprimida.

## III

En cuanto a la convicción por el robo, el argumento del apelante opera con dos criterios. En primer término, ataca la suficiencia de la prueba; en la alternativa, nos dice que el delito de robo quedó "confundido" con el de asesinato estatutario.

Hemos analizado con detenimiento la exposición narrativa de la prueba y concluimos que el delito de robo no se probó en el tribunal de instancia; el solo hecho de que el revólver de la víctima no apareciera en el lugar de los

hechos, sin más, no puede constituir prueba *suficiente* más allá de duda razonable de la sustracción, elemento indispensable del delito imputado. *Pueblo* v. *Asencio Trinidad*, 95 D.P.R. 473, 478 (1967).[1]

El testigo Waldemar Albelo Toledo declaró sobre este aspecto que su padre tenía licencia para portar armas y que poseía un revólver Smith & Wesson calibre 38. Fue a la caja registradora en busca del mismo y no lo encontró en ese lugar por lo que "supuso" que su padre lo tenía "encima". No existe prueba de que efectivamente el revólver estuviera en la caja ese día, ni de que su padre lo portaba al momento de los hechos. Tampoco hay prueba de que alguno de los asaltantes lo hubiese cogido de la caja o se lo hubiese quitado a su padre.

La prueba del perito en balística no es concluyente y poco ayuda en la determinación de si la víctima disparó un arma de fuego. No se practicó la prueba de parafina en el cadáver como las circunstancias aconsejaban.

Notamos que la herida en el hombro del apelante opera como fuerte indicio de forcejeo y lucha cuerpo a cuerpo. La posibilidad de que el occiso se la hubiese causado al hacer uso de su propia arma, y que ésta fuese luego sustraída del local por los asaltantes, es una entre otras. Nos preguntamos, sin embargo, en circunstancias de tanta fluidez como en las de un asalto, ¿qué posibilidades en contrario existen? No podemos resolver según posibilidades de culpabilidad.

---

[1] Independientemente, el argumento de confusión de delitos es inmeritorio. Aspira el apelante a que el delito de robo o su tentativa constituya meramente un agravante del asesinato. Como modalidad de su razonamiento pretende que en situaciones donde opere la figura del asesinato estatutario, y la muerte ocurra al efectuarse un robo, de probarse éste, sólo sea posible la convicción "por el delito mayor de asesinato en primer grado". Es decir, el robo queda "confundido" en el asesinato. El problema que confronta el argumento del apelante, es que el delito de robo en modo alguno constituye un delito *menor incluido* en el delito de asesinato. Por el contrario, se trata de un delito independiente. Por esta razón, la anotación que cita el apelante en 40 A.L.R.3d 1341 no es de aplicación bajo nuestro ordenamiento penal vigente.

El delito de robo no quedó establecido más allá de duda razonable como cuestión de derecho. *Pueblo* v. *Cabán Torres*, 117 D.P.R. 645 (1986).

## IV

El tercer señalamiento de error carece de méritos. Quedó demostrada la conexión del acusado con los delitos de asesinato en primer grado (modalidad del asesinato estatutario) y violaciones a la Ley de Armas. Los hechos probados en el tribunal de instancia establecieron más allá de duda razonable la comisión del delito de tentativa de robo.

Se bien el testigo Elliut Hernández declaró que vio la gorra que apareció en la escena del crimen el sábado 24 de noviembre de 1984, como a las 3:00 P.M., en la parte trasera del auto de su padre, es decir, después de la ocurrencia de los hechos, en ausencia de pasión, prejuicio o error manifiesto, no intervendremos en la apreciación que de la prueba hizo el juzgador de los hechos. Se trata básicamente de un asunto de apreciación y adjudicación de credibilidad. *Pueblo* v. *Borrero Robles*, 113 D.P.R. 387, 394 (1982); *Pueblo* v. *Pagán Díaz*, 111 D.P.R. 608 (1981); *Pueblo* v. *Millán Meléndez*, 110 D.P.R. 171 (1980).

La prueba del Pueblo presentada a los fines de establecer la responsabilidad criminal del apelante, en gran medida descansó en la evidencia ofrecida por un testigo presencial, el Sr. Waldemar Albelo Toledo que vio al apelante perpetrar los delitos imputados, lo describió con detalle y lo identificó luego en una confrontación celebrada dos días después de ocurridos los hechos. Cuando la Policía se personó a la residencia del herido, éste no pudo explicar satisfactoriamente cómo fue herido; su explicación fue inverosímil y contradictoria. Los señalamientos del apelante se circunscriben básicamente a una cuestión de apreciación de la prueba. No se justifica en este caso nuestra intervención.

Se confirman las sentencias apeladas en los casos de asesinato en primer grado y portación y posesión ilegal de armas, y se revoca la convicción por el delito de robo por insuficiencia de la prueba.

Así lo pronunció y manda el Tribunal y certifica el Secretario General. El Juez Asociado Señor Negrón García emitió opinión disidente. El Juez Asociado Señor Rebollo López concurre sin opinión escrita.

(*Fdo.*) Bruno Cortés Trigo
*Secretario General*

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

I

Discrepamos de la revocación de la convicción por el delito de robo del arma de fuego.

Más allá de duda razonable la prueba refleja que el comerciante Juan Albelo Morell —antes de ser ultimado por el apelante José Hernández Pagán— tenía expedida a su favor una licencia de posesión y portación de arma. Como tal, era dueño de un revólver Smith & Wesson calibre 38. De ordinario lo guardaba en la caja registradora. Al producirse el asalto dentro de su negocio, Albelo Morell lo resistió y forcejeó al extremo que —sin que la prueba precise cómo— el apelante Hernández Pagán recibió una herida de bala en el hombro. El arma de Albelo Morell no apareció en el negocio después del asalto. Frente a estos hechos, la sentencia del Tribunal expone:

> El testigo Waldemar Albelo declaró sobre este aspecto que su padre tenía licencia para portar armas y que poseía un revólver Smith & Wesson calibre 38. Fue a la caja registradora en busca del mismo y no lo encontró en ese lugar por lo que "supuso" que su padre lo tenía "encima". *No existe*

*prueba de que efectivamente el revólver estuviera en la caja ese día, ni de que su padre lo portaba al momento de los hechos. Tampoco hay prueba de que alguno de los asaltantes lo hubiese cogido de la caja o se lo hubiese quitado a su padre.*

La prueba del perito en balística no es concluyente y poco ayuda en la determinacion de *si el occiso disparó un arma de fuego.* No se practicó la prueba de parafina en el cadáver como las circunstancias aconsejaban.

Notamos que la herida en el hombro del apelante opera como *fuerte indicio del forcejeo y lucha cuerpo a cuerpo.* La posibilidad de que el occiso se la hubiese causado al hacer uso de su propia arma, *y que ésta fuese luego sustraída del local por los asaltantes, es una entre otras.* Nos preguntamos, sin embargo, en circunstancias de tanta fluidez como en las de un asalto, *¿qué posibilidades en contrario existen? No podemos resolver según posibilidades de culpabilidad.* (Énfasis suplido.) Opinión del Tribunal, pág. 431.

## II

Preocupa este razonamiento. Da la impresión de que el Tribunal está implantando una nueva doctrina y exige prueba directa, sin estimar la validez y el valor sustantivo de la circunstancial.

En la referida sentencia se incurre en unas serias contradicciones de análisis. Primero, de un lado se admite la existencia de causa, pero después se niega su existencia. Segundo, se habla de que no se le practicó la prueba de parafina al cadáver del occiso Albelo Morell. Desconocemos las razones y necesidad para ello. No se juzgaba a la víctima. Tercero, es un hecho no controvertido de que Albelo Morell se defendió. Se acepta como "fuerte indicio" que la herida en el hombro del apelante Hernández Pagán la causó aquél antes de ser asesinado.

Estas circunstancias, unidas al testimonio del experto en balística Ernesto J. Barrios—que atestó que los proyectiles encontrados en la escena del crimen y en el cadáver—

presentaban "las características que tenía el revólver que tenía el occiso al momento de los hechos", no admiten vacilación adjudicativa. Más allá de toda duda razonable demuestran que *el apelante Hernández Pagán* robó dicha arma. Después de todo, para establecer un hecho sólo se exige la "certeza o convicción moral en un ánimo no prevenido".

El jurado que actuó en este caso descargó su conciencia y evaluó integralmente esta prueba. Con juicio informado y directo, concluyó que la desaparición del arma fue resultado del asalto. No deberíamos sustituir ese veredicto desde este estrado distante apelativo, sino respetarlo.