*856 TEXTO COMPLETO DE LA SENTENCIA
En el presente recurso de apelación se solicita la revisión de las sentencias dictadas por el Tribunal de Primera Instancia, Sala Superior de San Juan, Hon. Kalil Baco Viera (TPI), el 29 de junio de 2006, notificadas el 3 de julio de 2006. Dicho foro condenó al apelante a la pena de reclusión de noventa y nueve (99) años en el cargo de Art. 106 del Código Penal de 2004, veinte (20) años en el cargo bajo el Art. 5.04 y diez (10) años en el cargo de Art. 5.15, ambos de la Ley de Armas de Puerto Rico. Se dispuso que las sentencias fueran cumplidas consecutivamente.
I
A Eric Román López se le imputó que allá para el 19 de agosto de 2005 en Río Piedras, ilegal, maliciosa, premeditada y criminalmente, dio muerte al ser humano Edgardo Merced Burgos, con intención de causársela, consistente en que utilizando un arma de fuego mortífera, la cual se describe como una pistola, con la parte superior niquelada y la parte de abajo color gris, hizo varios disparos hacia la víctima alcanzándolo en varias partes del cuerpo, ocasionándole la muerte. Se le imputó, además, la portación del arma de fuego descrita y la utilización de la misma en la comisión del delito de asesinato en primer grado.
*857 El juicio se celebró por tribunal de derecho el 30 y 31 de enero, 2 y 10 de febrero de 2006. Los testigos de cargo lo fueron: José Matos Pérez, Robert López Arroyo, Javier Ríos, Carmen Tirado, Nereida Merced Burgos, Omar M. Valdez Santiago, Dra. María Conte y Ferdinand Landrau Hernández. [1] El apelante no presentó testigos de defensa. El 10 de febrero de 2006, el TPI emitió fallo de culpabilidad en todos los casos y dictó las anteriormente señaladas sentencias el 29 de junio de 2006.
El 26 de julio de 2006 se presentó recurso de apelación que mediante la presente sentencia consideramos. Luego de una extensa serie de solicitudes de prórroga para su presentación, el 13 de marzo de 2008 se nos presentó la “Exposición Narrativa de la Prueba (Estipulada)”. El apelante presentó su alegato el 22 de agosto de 2008. Posterior a ello surgió una controversia entre las partes respecto la notificación del alegato del apelante al Procurador General y, en consecuencia, la fecha límite para la presentación del alegato del Procurador. Dicha controversia concluyó mediante moción informativa del Procurador General del 18 de diciembre de 2008, en la cual aceptó haber recibido un reenvió del alegato del apelante, a base de lo cual en dicha moción, el Procurador mismo recalcula que la fecha límite para la presentación de su alegato era el 14 de enero de 2009. El Procurador presentó su alegato en el día pautado.
Con el beneficio de los alegatos de las partes y la exposición narrativa de la prueba, atendemos el recurso y resolvemos,, confirmando el fallo de culpabilidad y las sentencias impuestas en los casos de asesinato en primer grado y por la portación y uso de armas de fuego.

RESUMEN DE LA PRUEBA PRESENTADA POR EL MINISTERIO PUBLICO

1. José Matos Pérez

Se desempeña como investigador forense en el Instituto de Ciencias Forenses (ICF). Fue uno de los funcionarios del ICF que se personó a la escena objeto de este caso, junto a la investigadora Vilma Díaz y el investigador Javier Ríos.
La función del testigo Matos Pérez ese día era la de tomar las fotografías en la escena, lo cual hizo. El lugar de los hechos estaba ubicado en un negocio-colmado en el Residencial San Fernando de Río Piedras. En la parte posterior del mismo se podían comprar comestibles, cervezas y se podía jugar billar.
Cuando los funcionarios mencionados llegaron a la escena hicieron una búsqueda para localizar posibles piezas de evidencia. El testigo Matos Pérez tomó fotografías en la entrada e interior del negocio donde ocurrió la muerte y en el área de la morgue del Hospital del Centro Médico donde fue conducido el occiso.
El testigo Matos Pérez describió el área del billar del negocio como uno iluminado, al igual que el área del mostrador del colmado. En el camino acordonado por la Policía no había mucha iluminación. Tampoco en el área del pasillo que conduce del colmado al área en que estaba ubicado el billar.
2. Robert López Arroyo y Carmen Tirado
El testimonio de los testigos Robert López Arroyo y la Sra. Carmen Tirado, funcionarios del ICF, fueron estipulados. Se aceptó que de declarar declararían que las piezas de evidencia consistentes en las tres (3) muestras de sangre levantadas en la escena son compatibles con la sangre del occiso.

3. Javier Ríos

Es el investigador forense que fungió como investigador primario a cargo de preparar el Informe de Hallazgo que contiene información sobre el lugar de los hechos, las personas que laboraron en la escena, los objetos *858 encontrados y la evidencia levantada. En su informe marcó varias piezas de evidencia, como la mancha de aparente sangre que estaba cerca del acceso al negocio, un casquillo de bala disparado, el croquis, una de las entradas del negocio, proyectil de plomo, blindaje de bala disparado, aparente picadura encontrada en el área del billar, el área de acceso al salón de billar y el propio salón de billar. Su informe hace alusión a la autopsia realizada a Edgardo Merced Burgos (víctima o Merced Burgos), con número A-4055-05. Luego de procesar la escena fueron a la morgue del Centro Médico a examinar preliminarmente el cadáver y le tomaron fotos. El informe describe los signos de violencia que presentaba el cadáver, tales como heridas de bala en distintas partes del cuerpo como espalda, hombro izquierdo, brazo derecho y muslo izquierdo.

4. Nereida Merced Burgos

Es la hermana del occiso Edgardo Merced Burgos. Lo identificó al día siguiente en el Centro Médico. Declaró, a preguntas de la representación legal del apelante, que reside en el Residencial San Femando, que el día de los hechos escuchó lo que sucedió, que vio salir a un tal “Mota” del área del colmado con algo que parecía un arma de fuego en las manos, que no podía precisar más debido a que estaba oscuro en el área. Ella no observó objeto visible, llevaba la mano en la cintura como si tuviera algo. A preguntas del Ministerio Publico, declaró que confrontó a “Mota” y le preguntó qué había pasado con su hermano y él se arrodilló frente a ella.

5. Omar M. Valdés Santiago

Tiene treinta (30) años de edad. Residía en el Residencial San Fernando para la fecha del 19 de agosto de 2005. Se encontraba como a las 9:00 p.m. entre los edificios 3 y 4 del Residencial San Femando dirigiéndose hacia el negocio, Colmado San Fernando. Entró al negocio, saludó a Edgardo Merced Burgos, a quien conocía hacía como diez (10) años, y solicitó un refresco a Ferdinand Landrau, dueño del negocio. Mercedes Burgos pidió un trago. El testigo Valdés Santiago estaba a su derecha. A la mano izquierda de Merced Burgos había un televisor. Ferdinand Landrau estaba aproximadamente a tres (3) pies detrás del mostrador. Continuó declarando Valdés Santiago que vio al apelante, Eric Román López (apelante o Román López), a quien identificó en el salón de sesiones el día del juicio y a quien había visto antes de entrar al negocio con dos individuos cerca de la entrada del negocio. Tenía una t-shirt blanca con mangas y pantalón corto azul. El otro individuo vestía pantalón negro y camisa blanca. Ambos eran de tez blanca. El testigo Valdés Santiago no los conocía a ninguno de los dos como residentes del Residencial San Fernando. Declaró el testigo Valdés Santiago que el apelante le hizo de cuatro a cinco disparos en la parte izquierda de la espalda de arriba hacia abajo. Describió que el apelante se le acercó al occiso y le hace las detonaciones a quema ropa por la espalda, lado izquierdo. La pistola la portaba el apelante en la mano derecha. La describe como cromada niquelada en la parte de arriba y gris en la parte de abajo.
Cuando comienzan los disparos, el testigo Valdés Santiago se cubrió detrás de la pared que hay detrás del mostrador sobre el cual brincó previamente. Siguió agachado y arrastrándose por el piso. Dentro del negocio estuvo de diez (10) a quince (15) minutos, luego de lo cual salió por la parte de atrás del negocio, a la carretera internándose en el Residencial San Fernando. No vio hacia donde salió el apelante.
El 22 de agosto de 2005, el testigo conversaba con Ferdinand Landrau cuando llegó el agente investigador del caso. El Sr. Landrau le indicó que el testigo Valdés Santiago estuvo presente. A preguntas del agente, el testigo Valdés Santiago le dijo que podía identificar al sospechoso. Se dirigió al cuartel con el agente quien le mostró nueve (9) fotografías demostradas en un documento que fue objeto de admisibilidad durante el juicio. Identificó al apelante con el número tres (3). Luego participó en una rueda de identificación compuesta de cinco individuos donde identificó al apelante con el número tres (3). También fue objeto de admisibilidad el documento que se cumplimenta en dichos casos.
El testigo Valdés Santiago describió el área donde está ubicado el negocio donde ocurrieron los hechos y describió la iluminación como excelente. Describió en las fotografías admitidas en evidencia la localización de la *859 víctima, el.dueño del negocio y el propio testigo. Además señaló la ubicación de) televisor, la nevera, la entrada del negocio, una ventana, el salón billar, la radiola, la gorra de la víctima y los objetos de iluminación del lugar.

Contrainterrosatorio

El testigo Valdés Santiago expresó que compartía con la víctima y le tenía aprecio, pero que no lo consideraba como amigo, pues pocas veces compartía con él. Expresó que estuvo disponible para prestar testimonio para esclarecer el asesinato y cooperar con las autoridades. El testigo Valdés Santiago ha visto y tenido armas de fuego. Conoce que la víctima tenía tatuajes, pero esa noche de los hechos no estaban visibles. Se los vio un día que estaba jugando baloncesto en camisilla. Declaró desconocer si la víctima había tenido problemas con la justicia. Declaró, además, que el 19 de agosto de 2005 llegó al Colmado San Fernando de la casa de su madre. Conocía el área desde pequeño, ya que se crió allí. Testificó que llegó al negocio y vio cuando su dueño le servía un trago a Merced Burgos. No puede precisar el trago que se le servía. Expresó que no señaló en su declaración jurada que Merced Burgos tuviere una gorrita puesta. Antes de entrar al negocio, el testigo Valdés Santiago vio niños en el área del negocio, pero no puede precisar cuántos eran. No había adultos acompañando a los niños. Señaló que a la hora de los hechos no había nadie jugando billar o al menos no se percató de ello. Desconocía el nombre del apelante. Lo conoció después de efectuada la rueda de confrontacióñ. No sabe si en la conversación habida con el agente investigador, días después de lo ocurrido, surgió una descripción de una persona gordita de camisa blanca que andaban buscando. El testigo Valdés Santiago no había escuchado de ninguna persona con apodo, de ningún sospechoso que había salido del colmado el día de los hechos con un arma de fuego en sus manos.
Le preguntaron al testigo Valdés Santiago sobre la descripción de la persona que disparó a lo que indicó que era joven, de tez blanca, que no lo había visto antes y que no tenía ningún tipo de máscara que le cubriera el rostro. Describió a la otra persona que andaba con el apelante con un pantalón negro y camisa blanca. Los vio en la entrada del negocio, expresó que no eran del área del Residencial San Fernando. El testigo Valdés Santiago no le expresó al dueño del negocio, a quien conocía con anterioridad, sobre la existencia de dos personas sospechosas afuera. Del apelante identificó el lunar que tenía en el rostro y que tenía cabello castaño. No mencionó el color de los ojos del apelante, tampoco si tenía barba o bigote. No mencionó si portaba reloj en su mano. Indicó al oficial que la persona que disparó tenía un brazalete de pantera; este dato no aparece de su declaración jurada que prestara en Fiscalía. Su declaración jurada no contiene expresión sobre la forma de la nariz, ni estatura aproximada, indicó que era de la estatura suya. Declaró que del Exhibits Núm. 95 no se puede precisar el lunar del apelante, pero independientemente de ello identifica al número tres (3) como el apelante. No tuvo que mirar a los demás componentes de la línea de confrontación porque rápidamente identificó al número 3. La persona más pequeña de la rueda de identificación era el número 3. El testigo Valdés Santiago vio el arma de fuego en la mano derecha del apelante. De su mano lo único que le llamó la atención fue el arma de fuego y el brazalete. No le vio tatuaje, vio al apelante hacer 4 ó 5 disparos.
En cuanto a la etapa investigativa, primeramente se llevó a cabo la identificación por fotografías y luego mediante rueda de detenidos. Él declaró que el Exhibits Núm. 94 que refleja la muestra de fotos demuestra que tres (3) de las personas tenían lunares en la cara. Antes de que se llevara a cabo la identificación por fotos, el testigo le había manifestado al agente investigador de la División de Homicidios de la Policía que la persona tenía un lunar debajo de la nariz, lado derecho. El único que tenía ese rasgo era el apelante, el número tres (3) de la muestra de fotografías. Era el más delgado de todos los de la muestra. El proceso de la identificación mediante rueda de detenidos se llevó a cabo en el Cuartel de la Policía de Puerto Rico. En ella sólo estuvo el testigo Vélez Santiago, le tomó segundos identificar al número tres (3). Declaró que sabía que el sospechoso del asesinato de su amigo estaba allí. No le habían dicho nada sobre si el acompañante del sospechoso estaba allí. Desde el mismo día 22 de agosto de 2005, el testigo tenía a su disposición las fotografías para la muestra de fotografías. Del 19 al 22 de agosto de 2005, el testigo no había comentado con nadie sobre el caso, incluso con Ferdinand Landrau, dueño del negocio.
*860 El testigo Valdés Santiago entró al negocio cuando ya la víctima estaba en el área del mostrador. Desde que el testigo entra y saluda a la víctima transcurren treinta (30) segundos. Desde que saluda a la víctima y pide el refresco transcurren otros varios segundos. Desde que pide el refresco y aparece la persona con el arma de fuego pasan otros varios segundos. Su atención se centró en el arma de fuego. La describió cromada en la parte de arriba y por abajo gris. Observó la parte gris del arma aunque era el área por donde estaba sujetada por el que disparaba. La asemeja al arma de fuego de reglamento de la Policía de Puerto Rico. No precisó su tamaño. Trascurrieron seis a siete segundos entre el momento que vio el arma hasta que le hacen los disparos a la víctima. Esos segundos fueron suficientes para observar el arma, estar pendiente de los disparos e identificar a la persona que disparaba. Declaró que el arma estaba alterada porque podía disparar rápido. Se quedó observando las 4 ó 5 detonaciones. Al cuarto disparo es que la víctima cae al piso. Luego del cuarto y quinto disparo es que el testigo Valdés Santiago brinca el mostrador. Estaba como a dos (2) pies de la víctima, se quedó parado mirando fijamente. Cuando se dispara el primer tiro no hizo nada por proteger a su amigo. En ningún momento lo hizo. Al momento de disponerse a brincar el mostrador todavía no había visto a la víctima caer. Está seguro que los cuatro disparos ocurrieron por la espalda de la víctima, de arriba hacia abajo en el lado izquierdo de la espalda. Todo ocurrió en cuestión de segundos. Una vez la víctima cae, el testigo Valdés Santiago no ve más al que disparó, ya que ha brincado el mostrador. Antes del 19 de agosto de 2005, el testigo no había visto a Román López ni tenía nada en su contra.

6. Patólogo, forense, Dra. María Conte

Se estipuló que se desempeñaba como patóloga forense en el ICF y que efectuó la autopsia en el presente caso, la que lleva el número de informe médico-forense 4055-05, sobre la persona de Edgardo Merced Burgos. (Exhibits Número 97). Declaró que el cuerpo reflejaba múltiples heridas de balas en diferentes partes del cuerpo, herida de bala en el codo derecho, con entrada y salida en la misma área, de derecha a izquierda; herida en el antebrazo derecho porción lateral de derecha a izquierda; herida en el hombro izquierdo; herida en la espalda superior, lado izquierdo, que penetró las vértebras torácicas y el proyectil laceró el corazón y se incrustó en el músculo cardíaco, de atrás hacia el frente. Finalmente, una herida en el área del frente de arriba hacia abajo. La herida que resultó fatal fue la que penetró las vértebras toráxicas y laceró el corazón. A preguntas de la defensa, contestó que la herida B, C y E fueron de frente, las ocurridas en la espalda son las heridas D y A y que la del codo entró por la parte de afuera del codo y salió por la parte de adentro.
7. Ferdinand Landrau Hernández.
El 19 de agosto de 2005, el señor Landrau abrió el negocio a las 5:45 a.m. Usualmente abría su negocio a las 9:30 o 10:00 de la noche. Alrededor de las 8:10 de la noche de ese día, llegó la víctima quien vivía en el Residencial San Fernando, y le dice “dame lo mío”, refiriéndose a un trago con “Passoa, Finlandia, Cranberry y China”. Se lo preparó. Cuando lo llamó para que recogiera el trago, suenan los tiros. Cuando esto sucedió había unas personas en el área del billar. En el área del mostrador estaba el testigo Valdés Santiago. Éste es vecino del Residencial San Fernando. Estaba viendo televisión y le había pedido un refresco. La persona que disparó venía de afuera del colmado, el testigo no lo vio.
Cuando Merced Burgos se volvió a buscar el trago, comenzó la persona a dispararle desde afuera. Lo único que pudo ver fue el brazo de la persona, tenía puesta una camisa blanca. El testigo Valdés Santiago estaba al lado izquierdo del testigo, y el televisor estaba al lado derecho de la espalda. Merced Burgos cayó frente al mostrador. El testigo Valdés Santiago brincó el mostrador y se fue hacia el patio de la casa del testigo Landrau Hernández, que queda al lado. Todo ocurrió en cuestión de segundos. La persona que disparó huyó hacia el interior del Residencial San Fernando. La iluminación en el negocio constaba de tubos grandes fluorescentes, y estaban encendidos esa noche.
La víctima y el testigo Valdés Santiago entraron por la primera puerta. El que mató a Merced Burgos no *861 llegó a entrar al negocio. En el Exhibit Núm. 22, se muestra el área del mostrador y el área donde cayó Merced Burgos.
El 22 de agosto de 2005, el agente Torres citó al testigo Landrau Hernández al Cuartel General. Le dijo que él oyó los disparos y vio la camisa blanca, porque Merced Burgos era-más alto y no pudo ver quién disparó. El sujeto venía tapado disparando por detrás. Nunca había visto antes ál acusado en el Residencial San Femando en los 31 años que lleva con el negocio.

Contrainterrogatorio

El testigo Landrau Hernández nunca había visto antes al acusado. El testigo Valdés Santiago y Merced Burgos entraron al local casi juntos. Valdés Santiago entró primero y estaba allí, tomándose un refresco antes de que entrara Merced Burgos. No observó que Merced Burgos y Valdés Santiago se saludaran.
Según la versión del testigo Landrau Hernández, la persona que disparó no llegó a entrar al local, y de esto está completamente seguro. Mientras le disparaban a Merced Burgos, el testigo no perdió contacto visual con él. La primera vez que observó a Román López fue en el Tribunal, porque nunca lo había visto en el área del Residencial San Femando. Los raidos de las detonaciones eran fuertes. El área del billar estaba cerrada con aire, había personas allí, y aparentemente se fueron por la puerta de ese salón cuando escucharon los disparos. Por-allí mismo fue que se fue Valdés Santiago. Cuando Merced Burgos calló, el sujeto que disparaba se viró de lado y le disparó.
Entre el 19 y el 22 de agosto de 2005, el testigo Landrau Hernández no había hablado con Valdés Santiago. El agente Torres entrevistó a Landrau Hernández en el colmado ese día. No sabe si Valdés Santiago le dijo al agente Torres que él sabía quién fue el que disparó porque lo había visto.

Re-directo

Merced Burgos, según le disparaban, caminaba hacia adentro del negocio, y el sujeto que le disparaba cambió la cara, mirando hacia el Residencial. Esto ocurrió en menos de un minuto. Esa área la limpió un muchacho que él le mandó lo hiciera. Según el testigo, para él parecían como 10 a 12 disparos, no sabe cuántos. Valdés Santiago estaba a mano derecha de Merced Burgos, como a un pie y medio. La persona que le disparó venía pegado a Merced Burgos.
A
La presunción de inocencia, uno de los derechos fundamentales que le asiste a todo acusado de delito, está consagrada en el Artículo II, Sección 11, de nuestra Constitución, el cual dispone que:

“[e]n todos los procesos criminales, el acusado disfrutará del derecho... a gozar de la presunción de inocencia.... ” .

Por otro lado, la Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110, establece, en términos más específicos, que:

“[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en todo caso de existir duda razonable acerca de su culpabilidad, se le absolverá. ”

Pueblo v. Irizarry, 156 D.P.R. 780 (2002).
*862 En cuanto a la evaluación y suficiencia de la prueba, la Regla 10 de las Reglas de Evidencia de Puerto Rico, 32 L.P.R.A. Ap. IV, dispone que:

“[e]l tribunal o juzgador de hechos deberá evaluar la evidencia presentada, a los fines de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los siguientes principios:

(a) El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por ninguna de las partes.... ”.

Pueblo v. Feliciano Rodríguez, 150 D.P.R. 443 (2000).
La máxima que rige nuestro ordenamiento a los fines de que la culpabilidad de una persona que ha sido acusada de delito sea demostrada con prueba suficiente y más allá de toda duda razonable es consustancial con la presunción de inocencia y constituye uno de los imperativos del debido proceso de ley. Pueblo v. Irizarry, supra; Pueblo v. León Martínez, 132 D.P.R. 746 (1993).
Con respecto al quántum de prueba en casos criminales, en Pueblo v. González Román, 138 D.P.R. 691 (1995), pág. 989, el Tribunal Supremo sostuvo que la evidencia presentada por el Ministerio Fiscal debe producir certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. A esos fines citamos:
“...El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea "suficiente", esto es, que "verse" sobre todos los elementos del delito imputado; se le requiere que la misma sea "suficiente en derecho". Ello significa que la evidencia presentada, "además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación" o en un ánimo no prevenido. Esa "insatisfacción" con la prueba es lo que se conoce como "duda razonable y fundada". Pueblo v. Rivero Diodonet, 121 D.P.R. 454 (1988); Pueblo v. Cabán Torres, 117 D.P.R. 645 (1986); Pueblo v. Carrasquillo, 102 D.P.R. 545 (1974); Pueblo v. Toro Rosas, 89 D.P.R. 169 (1963); Pueblo v. Ortiz Morales, 86 D.P.R. 456 (1962); Pueblo v. Feliciano Rodríguez, supra. ”
En Pueblo v. Maisonave, 129 D.P.R. 49 (1991), el Tribunal Supremo expuso, en síntesis, la doctrina que rige cuando de revisar fallos de culpabilidad se trata. Allí expresó que las determinaciones de hechos del tribunal de primera instancia no deben ser rechazadas de forma arbitraria, ni sustituidas por el criterio del foro apelativo, salvo que éstas carezcan de fundamento suficiente a la luz de la prueba presentada. Ciertamente, los foros de instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por tal razón, su apreciación merece gran respeto y deferencia. En fin, a menos que exista pasión, prejuicio, parcialidad y error manifiesto, o que la apreciación de la prueba se distancie de la realidad fáctica o ésta sea inherentemente imposible o increíble, el tribunal apelativo debe abstenerse de intervenir con la apreciación de la evidencia hecha por el tribunal de primera instancia. Pueblo v. Soto González, 149 D.P.R. 30 (1999).
B
La identificación correcta, certera y confiable del acusado es una etapa o fase esencial en el procedimiento criminal. Pueblo v. Mejias Ortiz, 160 D.P.R. 86 (2003); Pueblo v. Rodríguez Maisonet, 119 D.P.R. 302 (1987); Pueblo v. Gómez Incera, 97 D.P.R. 249 (1969). Constituye el eslabón indispensable para conectar al acusado con la comisión de un delito en calidad de autor responsable. Resumil, Derecho Procesal Penal, Equito, 1990, Tomo I, p. 326. Para determinar si la identificación de un sospechoso es válida, deben dilucidarse dos cuestiones principales, a saber: (1) si la identificación es confiable, y (2) si en el curso de la misma no hubo irregularidades que afectasen irremediablemente los derechos sustanciales del acusado. Pueblo v. Torres Rivera, 137 D.P.R. 630 (1994). Ya fuere la identificación efectuada por el método de fotografías o rueda de detenidos, *863 el análisis para determinar la validez de la identificación se hará a base de la totalidad de las circunstancias que rodearon la misma. Pueblo v. Mejias Ortiz, supra; Pueblo v. Ortiz Pérez, 123 D.P.R. 216 (1989).
Por su parte, la Regla 252 de Procedimiento Criminal, 34 L.P.R.A. Ap. IV, regula el procedimiento de identificación de sospechoso, cuando éste es dirigido o controlado por los funcionarios del Estado, por medio de la celebración de una rueda de detenidos o la utilización de fotografías. Aunque en casos en que el perjudicado de la comisión de un delito no conoce personalmente al sospechoso, el procedimiento más aconsejable a seguirse por las autoridades lo es la realización de una rueda de detenidos, el mero hecho de que dicho procedimiento no sea celebrado, no tiene el efecto per se de viciar o hacer inadmisible como evidencia la identificación llevada a cabo. Pueblo v. Rodríguez Román, 128 D.P.R. 121 (1991); Pueblo v. Robledo, 127 D.P.R. 964 (1991).
Aun en casos en que haya habido alguna desviación al procedimiento pautado en la Regla 252 de Procedimiento Criminal, no acarrea automáticamente la supresión de la evidencia de identificación o la revocación de la sentencia de convicción. Pueblo v. Rivera Narváez, 113 D.P.R. 642 (1982). Lo importante es que la identificación se haya hecho libre, espontánea y confiable. Pueblo v. Ramos Álvarez, 122 D.P.R. 287 (1988). Aun descartándose la identificación efectuada en la etapa investigativa, la identificación efectuada en sala es válida, siempre que no dependa ni sea producto de la sugestividad que vició la identificación en la etapa investigativa. Pueblo v. Rey Marrero, 109 D.P.R. 739 (1980).
Al evaluar si están presentes suficientes elementos de confiabilidad a la luz de la totalidad de las circunstancias, los jueces deben guiarse por los siguientes criterios: (1) la oportunidad que tuvo el testigo de observar al ofensor al tiempo en que cometía el crimen; (2) el grado de atención del testigo; (3) la corrección de la descripción previa del ofensor por el testigo; (4) el nivel de certeza demostrado por el testigo en la confrontación; y (5) el tiempo transcurrido entre el crimen y la confrontación. Pueblo v. Robledo, ante; Pueblo v. Hernández Pagán, 119 D.P.R. 424 (1987); Pueblo v. Peterson Pietersz, 107 D.P.R. 172 (1978).
Finalmente, es menester señalar que en la apelación, la conclusión del juzgador de los hechos sobre la suficiencia de la prueba confiable para la identificación de un acusado tiene todo el respeto y validez que ordinariamente se extiende a las determinaciones de hechos. El juzgador está en mejor posición para la adjudicación y credibilidad; por lo tanto, sus determinaciones sólo deben suplantarse si no están sostenidas por la prueba. Pueblo v. Rodríguez Román, ante; Pueblo v. Hernández Pagán, ante.
III
El apelante nos señala que procede la revocación de las sentencias en su contra debido a que no se probó más allá de duda razonable su culpabilidad por los delitos imputados. No le asiste la razón.
Al apelante se le imputó el delito de asesinato en primer grado y portar y disparar un arma de fuego en contravención de la ley. La prueba estableció todos los elementos de los delitos imputados y la conexión con el apelante mediante una identificación conforme a derecho. Contrario a lo que alega el apelante, la prueba desfilada controvirtió la presunción de inocencia que cobija a todo acusado de delito en nuestro ordenamiento constitucional y su culpabilidad, como hemos informado, fue probada más allá de duda razonable. De un análisis de la prueba presentada, se desprende que la misma fue satisfactoria, convincente y suficiente en derecho. El testigo Valdés Santiago observó plenamente al apelante, antes y durante los disparos. Explicó los detalles de sus observaciones que le permitieron identificar a la persona del agresor. Había visto al apelante fuera del negocio junto a dos personas más antes de que se efectuaron los disparos, esto es sin ningún tipo de aprehensión o nerviosismo propio de dicho evento. También lo observó durante los disparos, segundos después. A los tres (3) días de los hechos le expresó al agente investigador que podía identificar al agresor. La descripción dada del apelante era la de joven, de tez blanca, sin máscaras, cabello castaño y lunar debajo de la nariz, en su lado derecho.
*864 Mediante los mecanismos de identificación oficial también identificó al apelante con seguridad tanto mediante el método de fotografías como de rueda de confrontación. Conoció el nombre del apelante luego de identificarlo en la rueda de confrontación. Esta identificación fue una rápida, con seguridad por parte del testigo Valdés Santiago. No detectamos violación en la forma y manera que se efectuaron las identificaciones en la etapa investigativa ni las identificaciones en las diferentes etapas judiciales del proceso, en especial la efectuada en el juicio. Su testimonio no es contrario al vertido en el juicio por el testigo Landrau Hernández. El hecho de que éste no alcanzara a ver el rostro del agresor no impide que el testigo Valdés Santiago sí lo haya visto. Recordemos que el dueño del negocio está dentro de su establecimiento y el testigo Valdés Santiago viene desde afuera donde ve a la persona del apelante junto con otra persona por primera vez.
La prueba pericial confirmó en parte el testimonio del testigo Valdés Santiago en el sentido de la ubicación de los impactos de bala de magnitud en la espalda, que de hecho fueron los que ocasionaron la muerte al penetrar las vértebras torácicas y lacerar el corazón al incrustarse en el músculo cardíaco. Los disparos llevados a cabo en la espalda y por el frente concuerdan con el testimonio de los hallazgos periciales, el testimonio de Valdés Santiago y el de Landrau Hernández. Ciertamente, Valdés Santiago sólo observó los disparos hechos por la espalda de la víctima, el testigo Landrau Hernández vio los efectuados de frente, momento ya en que Valdés Santiago había brincado el mostrador para esconderse.
Tal y como fue el juicio del juez de instancia, la prueba del Ministerio Publico satisface nuestra conciencia. Cuando un tribunal apelativo revisa la cuestión de derecho de si se probó la culpabilidad del acusado más allá de duda razonable, hay que tomar en consideración que la apreciación de la prueba y la credibilidad de los testigos le corresponde primeramente al tribunal de primera instancia; de ahí que el foro apelativo sólo intervendrá con tal apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto. Sólo ante la presencia de estos elementos o cuando la apreciación de la prueba no concuerde con la realidad fáctica o se trate de evidencia inherentemente increíble o imposible, se justifica la intervención del tribunal apelativo con la apreciación de la prueba que hizo el juzgador.
IV
En atención con lo antes expuesto, confirmamos las sentencias apeladas en todos sus extremos.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
María Elena Pérez Ortiz Secretaria del Tribunal de Apelaciones
ESCOLIO 2009 DTA 31

1. La testigo Vilma Díaz era la funcionaría del ICF que tomaría el video, pero no lo hizo porque se dañó la cámara. No fue utilizada por el Ministerio Publico; la puso a disposición de la defensa quien no la utilizó tampoco.