EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>José García Cartagena<br><br>Recurrido<br><br>_____<br><br>El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Víctor J. Díaz Fontánez<br><br>Recurrido | Certiorari<br><br>2024 TSPR 59<br><br>213 DPR ___ |

Número del Caso:  CC-2023-0136

Fecha:  10 de junio de 2024

Tribunal de Apelaciones:

    Panel XI

Oficina del Procurador General:

    Hon. Fernando Figueroa Santiago
    Procurador General

    Lcda. Mabel Sotomayor Hernández
    Subprocuradora General

    Lcdo. Omar Andino Figueroa
    Subprocurador General

    Lcda. Marie Díaz De León
    Procuradora General Auxiliar

    Lcdo. Orlandy Cabrera Valentín
    Procurador General Auxiliar

    Lcda. Aracelis Burgos Reyes
    Procuradora General Auxiliar

Representantes legales de los recurridos:

    Lcdo. Jesús Miranda Díaz
    Lcda. Iris Yaritza Rosario Nieves

Materia: Sentencia con Opinión de Conformidad y Opinión Disidente.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br>Peticionario<br>v.<br>José García Cartagena<br>Recurrido<br>_____<br>El Pueblo de Puerto Rico<br>Peticionario<br>v.<br>Víctor J. Díaz Fontánez<br>Recurrido | CC-2023-0136 | |

**SENTENCIA**

En San Juan, Puerto Rico, a 10 de junio de 2024.

Luego de haber expedido el recurso de *certiorari* en este caso, se modifica la *Sentencia* del Tribunal de Apelaciones a los fines exclusivos de reconocer que el veredicto del jurado contra el Sr. Víctor J. Díaz Fontánez por el delito de tentativa al Artículo 198 del Código Penal del 2004, Caso Núm. EBD2011G0337, fue unánime, por lo que no procede la celebración de un nuevo juicio como decretó incorrectamente el foro recurrido.

Así modificada la *Sentencia*, se mantiene inalterada la misma en cuanto a los demás asuntos por este Tribunal encontrarse igualmente dividido.

Lo acordó el Tribunal y lo certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martinez emitió una Opinión de conformidad. El Juez Asociado señor Rivera García emitió una Opinión disidente, a la cual se une el Juez Asociado señor Martínez Torres, la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Kolthoff Caraballo.

El Juez Asociado señor Feliberti Cintrón emitió la expresión siguiente:

"El Juez Asociado señor Feliberti Cintrón está *conforme* con lo provisto en la Sentencia aquí emitida por otros fundamentos a los consignados por el Tribunal de Apelaciones en su *Sentencia* con fecha del 4 de noviembre de 2022, notificada el día 7 de ese mismo mes y año, en los casos consolidados: El Pueblo de Puerto Rico v. José A. García Cartagena, KLAN202100078 y El Pueblo de Puerto Rico v. Víctor Javier Díaz Fontánez, KLAN202100540."

Javier O. Sepúlveda Rodriguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>José García Cartagena<br><br>Recurrido<br><br><br>El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Víctor J. Díaz Fontánez<br><br>Recurrido | CC-2023-0136 | Certiorari |

Opinión de conformidad emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 10 de junio de 2024.

Víctor y José, en plena juventud, tomaron un camino que creyeron era más fácil y, en ese trayecto, complicaron su vida al tener que responder penalmente por múltiples delitos. Hoy nos enfrentamos a la tarea de precisar el alcance y extensión de su responsabilidad penal. Para ello, tenemos dos caminos: (1) reconocer los requisitos dispuestos por el legislador en el derogado texto del Art. 106 (b) del Código Penal de 2004, infra, o (2) desconocer esa realidad jurídica y embarcarnos en el empinado camino de imponerle indebidamente a Víctor y a José la

posibilidad de cumplir años de cárcel adicionales, a pesar de que no es lo que procede en Derecho. Estoy conforme con que este Tribunal no haya acudido esta última opción.

Por estar igualmente divididos en criterio los miembros de este Foro, se confirmó la Sentencia recurrida del Tribunal de Apelaciones que resolvió que no se configuraron los requisitos dispuestos por el legislador en el derogado Art. 106(b) del Código Penal de 2004. Estoy conforme con tal resultado y, a continuación, expongo las razones por las que coincido con tal conclusión.

Por la importancia de los eventos fácticos y su particularidad, procedo a consignarlos.

## I

Según se desprende de las determinaciones de hecho consignadas en la Sentencia recurrida, el 3 de agosto de 2010, el Sr. Víctor J. Díaz Fontánez (señor Díaz Fontánez) llamó al Sr. Joel Carrasquillo Castillo (señor Carrasquillo Castillo) para preguntar si el Sr. Yessel Y. López Medina (señor López Medina) y el Sr. José García Cartagena (señor García Cartagena) participarían en un robo.

Más tarde ese día, hubo una reunión en casa del Sr. Saúl Rivera Torres (señor Rivera Torres) para planificar cómo asaltar la Joyería San José, ubicada en San Lorenzo. En la reunión participaron el señor Carrasquillo Castillo, el señor García Cartagena, el señor López Medina, el señor

Rivera Torres y el Sr. Carlos Feliciano Rivera (señor Feliciano Rivera).

En la reunión, el señor Rivera Torres explicó que la joyería era atendida por un señor mayor que utilizaba un beeper para abrir la puerta de entrada al negocio. El plan era que el señor García Cartagena entraría primero a la joyería, anunciaría el asalto y lo amarraría con unos straps. Cuando el señor García Cartagena tuviera dominado al señor mayor, tenía que quitarle el beeper y abrir la puerta de la joyería para que el señor Carrasquillo Castillo y el señor López Medina entraran a robar las prendas.

El señor Feliciano Rivera sería el chofer en su carro y el señor Díaz Fontánez estaría en otro carro esperándolos por el lado de un pasillo cerca de la joyería San José. Por último, el señor Rivera Torres mencionó que el señor Díaz Fontánez y él se encargarían de vender las prendas robadas y el producto de la venta se repartiría entre todos. El señor Díaz Fontánez fue quien compró el arma de juguete[1] tipo revólver color negro y los straps que serían utilizados en el robo.

Antes de perpetrar el robo, el señor Carrasquillo Castillo observó que la joyería estaba siendo atendida por

---

[1] En el Juicio, la Sargento Villanueva Álvarez de la División de Homicidios, quien fue asignada al caso, indicó que "la pistolita es de las que cuestan uno y pico". Petición de Certiorari, pág. 19.

una persona que no era mayor o fácil de dominar, como le habían dicho, por lo que desistió de entrar a la joyería. Debido al cambio en el plan, el señor Feliciano Rivera les dijo "que ya estaban allí y que eso era meterse rápido y ya". Ante lo manifestado, le pasaron al señor Feliciano Rivera un bulto y al señor López Medina una herramienta para romper la vitrina.

Previo a comenzar el asalto, el señor Carrasquillo Castillo se movió a una esquina más abajo para poder observar lo que ocurriría en la joyería, mientras que el señor López Medina, el señor García Cartagena y el señor Feliciano Rivera esperaban en el pasillo. Cuando el cliente que estaba en la joyería salió, el señor Díaz Fontánez le avisó por teléfono al señor Carrasquillo Castillo, quien a su vez le aviso al señor García Cartagena, al señor López Medina y al señor Feliciano Rivera. Este último se acercó a la joyería y comenzó a hablar con el Sr. José F. Muñoz Aponte (señor Muñoz Aponte), el hijo del dueño de la joyería, quien se encontraba parado frente a las vitrinas exteriores del negocio.

Acto seguido, el señor Feliciano Rivera y el señor Muñoz Aponte entraron a la joyería. Al entrar, el señor Feliciano Rivera le brincó encima al señor Muñoz Aponte y le anunció el asalto. Acto seguido, el señor Feliciano Rivera golpeó al señor Muñoz Aponte en el rostro,

causándole una herida en la boca y que se le cayeran sus espejuelos. En el transcurso del asalto, el señor Feliciano Rivera le decía al señor Muñoz Aponte que abriera la entrada mientras lo tenía encañonado. El señor Muñoz Aponte veía que en el exterior de la puerta había alguien parado, pero no lo podía distinguir. Quien se encontraba afuera y frente a la entrada de la joyería era señor García Cartagena, en espera de que le abrieran la puerta. Ante el reclamo del señor Feliciano Rivera, el señor Muñoz Aponte metió la mano en su bolsillo y cuando sacó las llaves y el <u>beeper</u> para abrir la puerta, fue empujado por señor Feliciano Rivera y las llaves y el <u>beeper</u> cayeron al suelo. En ese mismo instante, el señor Muñoz Aponte metió nuevamente la mano en su bolsillo y sacó una pistola, para la cual tenía permiso, e hizo un disparo al señor Feliciano Rivera. Una vez realizado el disparo, el señor Feliciano Rivera soltó al señor Muñoz Aponte y cayó al suelo herido de bala en el abdomen.

Coetáneo al momento de la entrada de señor Feliciano Rivera a la joyería, el señor Carrasquillo Castillo se dirigió hacia el pasillo para decirle al señor López Medina que estuviera listo para entrar. Llegando este al pasillo, escuchó el disparo. Ante la detonación, el señor Carrasquillo Castillo comenzó a correr hacia el carro y, cuando volteó, vio al señor López Medina y al señor García Cartagena detrás de él. Una vez estaban en el vehículo,

el señor Carrasquillo Castillo llamó al señor Díaz Fontánez para decirle que habían matado al señor Feliciano Rivera. Luego, el señor Carrasquillo Castillo pidió bajarse del auto y llamó al señor Díaz Fontánez para que lo recogiera cerca del garaje de gasolina.

En el mismo momento que el señor Carrasquillo Castillo llega al garaje, también llegaron unos policías, quienes entrevistaron al señor Carrasquillo Castillo de forma general, pero antes de que este se montara en el auto del señor Díaz Fontánez, lo detuvieron como sospechoso. Ante la intervención de los policías, el señor Díaz Fontánez se fue del lugar.

De otro lado, los primeros agentes que llegaron a la joyería pudieron hablar con el señor Feliciano Rivera antes de ser atendido por los paramédicos y transportado al hospital, mas este murió a causa del disparo a las 9:28 p.m. de ese día.

Como parte de la investigación policiaca, se determinó que el arma utilizada por el señor Feliciano Rivera durante el asalto era de juguete y que en la joyería no faltó mercancía alguna. Es decir, no se materializó el robo. No se ocupó ningún otro tipo de arma. Por u1timo, resulta pertinente mencionar que el señor Carrasquillo Castillo fue el único de los coautores del robo a la joyería que fue arrestado el día de los hechos, que fue identificado en una rueda de detenidos y que prestó una

declaración jurada el 10 de agosto de 2010. Como parte del proceso de investigación, y ante la muerte del señor Feliciano Rivera, este decidió confesar todo lo sucedido. Durante este proceso investigativo, el señor Carrasquillo Castillo estableció que su declaración era a cambio de nada.

## II

El 29 de junio de 2012, un jurado encontró culpable al señor Díaz Fontánez y al señor García Cartagena (en conjunto, los Recurridos) de los delitos de conspiración (Art. 249 del Código Penal de 2004), tentativa de robo (Art. 198 del Código Penal de 2004) y asesinato en primer grado o asesinato estatutario (Art. 106(b) del Código Penal de 2004).[2] Tras varios incidentes procesales innecesarios de pormenorizar, los Recurridos apelaron el dictamen ante el Tribunal de Apelaciones bajo los argumentos de insuficiencia de prueba solamente con respecto al elemento de intención requerido al delito de asesinato estatutario y falta de veredicto unánime en virtud de lo resuelto en Pueblo v. Torres Rivera II, 204 DPR 288 (2020).

---

[2] 33 LPRA ant. secs. 4877, 4826, 4734. En específico, el señor García Cartagena fue hallado culpable de asesinato estatutario por veredicto de mayoría 10-2 y el señor Díaz Fontánez por mayoría 11-1. Además, se le halló culpable 9-3 de portación y uso de armas sin licencia. En cuanto a la pena por asesinato estatutario, a cada uno se le impuso una pena de noventa y nueve (99) años sumado a las penas de los demás delitos por los que fueron hallados culpables.

En lo aquí pertinente, el foro apelativo intermedio revocó la convicción por asesinato estatutario por insuficiencia de prueba. Razonó que el Art. 106(b) exige la intención de causar la muerte a un ser humano y no que esta sea como un incidente causal en el transcurso de la consumación o tentativa del delito. Resolvió que de la prueba surgía que los Recurridos nunca tuvieron la intención de cometer un asesinato, sino que solo acordaron asaltar la joyería y que ello encontraba respaldo en el interés inequívoco de obtener un arma de juguete para perpetuar el robo. A su vez, fundamentó que debido a los cambios introducidos mediante el Código Penal de 2004 y lo resuelto en <u>Pueblo en Interés del Menor ESMR</u>, 189 DPR 787 (2013) solamente estarían sujetos a incurrir en asesinato estatutario los autores que comentan un asesinato como consecuencia natural de la consumación o tentativa de un delito base.

Por lo anterior, dispuso que resultaba incompatible imputarle a los Recurridos el delito de asesinato estatutario cuando la muerte del señor Feliciano Rivera fue ocasionada a manos del señor Muñoz Aponte, víctima del intento de robo, el cual le disparó al intentar repeler el robo.[3] Al respecto, concluyó que la muerte del señor

---

[3]Ahora bien, el Tribunal de Apelaciones razonó que tampoco a la víctima se le puede imputar el delito de asesinato por igualmente carecer del elemento de intención

Feliciano Rivera a manos de la víctima de robo no cumple con el elemento de intención codificado en el Art. 106(b) del Código Penal de 2004.[4] Por otro lado, el foro intermedio anuló los veredictos de culpabilidad donde no hubo unanimidad y devolvió al foro primario para la celebración de un nuevo juicio.

Insatisfecho, el Estado, por conducto del Procurador General, recurrió ante nos y sostuvo que el Tribunal de Apelaciones erró al revocar la convicción del delito de asesinato estatutario de los Recurridos fundamentado en que "nunca tuvieron la intención de ocasionarle la muerte a un ser humano (cometer un asesinato) en ocasión de cometer o intentar cometer el robo".[5] En apoyo a su contención, manifestó que el foro intermedio, en primer lugar, pasó por alto que por definición y diseño legislativo el elemento subjetivo de intención se puede configurar bajo tres (3) escenarios distintos en virtud del Art. 23 del Código Penal

---

de matar conforme exige la definición de asesinato del Código Penal de 2004.

[4] El foro apelado analizó que, aun aplicando la doctrina de causa próxima aplicable antes de las enmiendas al Código Penal de 1974, se llegaría al mismo resultado por la muerte haber sido provocada por un tercero. Adujo que la muerte del señor Feliciano Rivera fue consecuencia de sus propios actos al ser el único que estaba dentro de la joyería. En cuanto esto, expresó que el señor García Cartagena estaba fuera de la joyería y que el señor Díaz Fontánez se hallaba distante de la joyería.

[5] Véase, Petición de certiorari, pág. 2; Alegato del Pueblo, págs. 3-4.

de 2004, _infra_, que van más allá de la intención directa (dolo directo de primer grado o propósito) del inciso (a).

En segundo lugar, arguyó que el Tribunal de Apelaciones ignoró que _Pueblo en Interés del Menor ESMR_, supra, no limitó que se pudiera cometer un asesinato estatutario bajo el Código Penal de 2004 únicamente si se demostraba la intención directa (o dolo directo de primer grado) de ocasionarle la muerte a un ser humano. Añadió que en dicho precedente se reconoció que el delito de asesinato estatutario se podía cometer si este era una consecuencia natural de la conducta voluntaria del autor o cuando el sujeto ha incurrido en la conducta a conciencia de que implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado, o lo que sería igual a la intención bajo el elemento subjetivo de dolo eventual, según el inciso (c) del Art. 23 del Código Penal de 2004.

Asimismo, argumentó que los hechos y la evidencia que se presentó demostraron que los Recurridos tuvieron la intención de cometer el delito base de robo o su tentativa mediante el uso de fuerza y violencia y que con ello pusieron en marcha una cadena de eventos que culminó -como consecuencia natural de su conducta voluntaria- con la muerte no casual de uno de los conspiradores.

A su vez, el Estado señaló que de la prueba que desfiló quedó claro que la muerte del señor Feliciano Rivera fue una consecuencia natural de su propia conducta,

la cual es imputable a los Recurridos como coautores del delito.[6]

Así las cosas, y tras denegarse la expedición del recurso en dos (2) ocasiones, una mayoría de este Tribunal aceptó intervenir en la controversia.

Por su parte, los Recurridos adujeron que la controversia de este caso giraba en torno al significado de la frase "consecuencia natural", según tipificada en el Art. 106 (b) del Código Penal de 2004. Al respecto, sostuvieron que la intención del legislador al redactar el delito de asesinato estatutario en el Código Penal de 2004 requería que la muerte acaecida en la comisión de uno de los delitos bases allí mencionados fuese una muerte intencional o querida conforme la naturaleza, según concebida en el elemento subjeto de intención bajo el inciso (b) del Art. 23. Arguyeron que ello implicaba que el juzgador de hechos debía evaluar si en la comisión del delito grave base, el sujeto conocía que el resultado

---

[6]Véase, Alegato del Pueblo, págs. 37. Al respecto expresó que: Carlos [señor Feliciano Rivera] sabía o debía saber que su conducta había creado un riesgo considerable y que ello podía conllevar su muerte o la del señor Muñoz Aponte. Es ahí donde se configuran la intención en su modalidad de dolo en segundo grado y dolo eventual. La muerte de Carlos fue consecuencia natural de su propia conducta que había creado un riesgo considerable no permitido… En vista de lo anterior, la conducta y muerte de Carlos puede serle atribuida e imputada a los señores García Cartagena y Díaz Fontánez como co-autores de la tentativa de robo. Mediante la co-autoría, todos los participantes de la comisión de un delito o su tentativa son responsable de las consecuencias que allí surjan. Íd., pág. 38.

final se presentaría como una consecuencia necesaria o segura de su conducta. Añadieron que no bastaría que se probara que la persona acusada hubiese querido realizar la conducta prohibida con conocimiento de que su conducta conllevaba un riesgo considerable y no permitido de producir la muerte conforme al inciso (c) del Art. 23 (dolo eventual o temeridad), sino que se constituyera un "riesgo típicamente relevante".[7]

Referente a ello, los Recurridos expresaron que al planificar el robo en la joyería nunca se habló de darle muerte a una persona, por lo que el día de los hechos fueron con una pistola de juguete y sin intención de dar muerte a alguien. Por ello, argumentaron que a base de la prueba que se presentó no se podía deducir o prever la intención de dolo de segundo grado en el inciso (b) del Art. 23, ya que este no concibe una mera probabilidad, sino una alta probabilidad del resultado.

Así las cosas, y contando con el beneficio de la comparecencia oral y escrita de las partes, procedo a exponer brevemente el Derecho aplicable que sustenta mi postura.

---

[7] Véase, Alegato de parte recurrida, pág. 23.

**III**

**A.**

La figura del asesinato estatutario o <u>felony murder
rule</u> no es nueva en nuestro ordenamiento penal.[8] En
apretada síntesis, mediante el asesinato estatutario se
sanciona con una pena más severa a aquella persona que
produce la muerte de un ser humano al consumar o intentar
consumar uno de ciertos delitos graves que se especifican
en la ley (llamados delitos base).[9] Bajo el derogado Código
Penal de 1974, Ley Núm. 115 de 22 de julio de 1974, solo
se requería establecer que la causa próxima de la muerte
fue la comisión de uno de los delitos base o su tentativa.
D. Nevares-Muñiz, <u>Código Penal del Estado Libre Asociado</u>,
2da. Ed. rev., supra, 2005, pág. 143 (citas omitidas).

De esta manera, no era necesario presentar prueba
alguna de que el asesinato fue premeditado, deliberado y
voluntario, entiéndase, sobre la presencia del elemento
de intención. En su lugar, el elemento mental requerido

---

[8] Para un análisis crítico sobre el desarrollo
histórico, dogmático y jurisprudencial del asesinato
estatutario, véanse, L.A. Zambrana González, <u>Análisis
dogmático-penal del asesinato estatutario y su
normatividad en Puerto Rico</u>, 92 Rev. Jur. U.P.R. 21 (2023);
M. Gómez Guerrero, <u>El efecto del cambio en la redacción
del asesinato estatutario</u>, 47 Rev. Der. PR. 227 (2008).

[9] "El que se pruebe fuera de toda duda un asesinato
estatutario no necesariamente significa que quedó probado
el delito grave base. Tampoco hay confusión de delitos
entre el delito base y el asesinato". D. Nevares-Muñiz,
<u>Código Penal del Estado Libre Asociado</u>, 2da. Ed. rev.,
supra, 2005, pág. 143 (citando a <u>Pueblo v. Hernández Pagán</u>,
119 DPR 424 (1987) (Sentencia)).

era el delito base, lo que constituía un asesinato en primer grado por fuerza de ley. Íd. Esta norma, como sabemos, sufrió un cambio trascendental con la adopción del entonces Código Penal de 2004, Ley Núm. 149-2004, 33 LPRA ant secs. 4629 et seq. (Código Penal de 2004).

En lo pertinente, y por ser el Código aplicable a la controversia de autos, el Art. 105 del Código Penal de 2004 definió asesinato como **"dar muerte a un ser humano con intención de causársela"**. (Negrillas suplidas). 33 LPRA ant. sec. 4733. A su vez, en su Art. 105 se codificaron los diferentes grados de asesinato, siendo estos:

> **Constituye asesinato en primer grado**:
> (a) Todo asesinato perpetrado por medio de veneno, acecho o tortura, o con premeditación.
> (b) **Todo asesinato que se comete como consecuencia natural de la consumación o tentativa de algún delito de** incendio agravado, agresión sexual, *robo*, escalamiento agravado, secuestro, secuestro de un menor, estrago, envenenamiento de aguas de uso público, agresión grave en su modalidad mutilante, fuga, maltrato intencional o abandono de un menor.[10]

---

[10]En la Ponencia que presentó el Profesor Ernesto L. Chiesa Aponte ante la Comisión de lo Jurídico del Senado, expresó que el inciso (b) del Art. 23 se refiere al dolo directo de segundo grado del derecho continental, y que era mejor utilizar "consecuencia natural" que "consecuencia necesaria". Necesario es aquello cuya negación implica contradicción, lo apodíctico, como las verdades matemáticas. **Es suficiente con el que el resultado sea consecuencia natural o casi segura de lo querido**. La sección 2.02(b) del Código Penal Modelo alude a **"practically certain"**. (Negrillas suplidas). Ernesto L.

(c) […]
        **Toda otra muerte intencional** de un
ser humano constituye asesinato en segundo
grado. (Negrillas suplidas). 33 LPRA ant.
sec. 4734.

En el trámite legislativo del P. del S. 2302 -que
culminó en la Ley Núm. 149-2004 o el Código Penal de 2004-
el Comité de Derecho Penal de la Academia Puertorriqueña
de Jurisprudencia y Legislación rindió un informe ante la
Comisión de lo Jurídico del Senado donde explicó el texto
del Art. 106(b).[11] En particular, expresó:

> En la letra (b) se mantiene la figura del
> asesinato estatutario, pero **se incorpora
> la exigencia** de que el asesinato se cometa
> **como consecuencia natural de los delitos
> que se mencionan**. Sólo entonces...el
> asesinato aparece como realización de la
> peligrosidad propia de los delitos
> enumerados y no como consecuencia al azar.
> Por otra parte, **se exige que se trata de
> un verdadero "asesinato"**, subsumible en la
> definición del Artículo anterior: **no
> cualquier muerte, sino solo la muerte
> intencional por parte del sujeto**. Otra
> cosa contradiría la definición del
> Artículo [105] anterior y la definición
> "asesinato en primer grado" del presente
> artículo.
> Esta expresión se complementa con lo
> dispuesto en el Artículo 25 (Riesgo
> Permitido) de la Academia Puertorriqueña
> de Legislación y Jurisprudencia, que
> dispone: **"No incurre en responsabilidad la
> persona que ha causado un resultado
> tipificado como delito si dicho resultado
> no constituye la realización de un riesgo**

---

Chiesa Aponte, Ponencia ante la Comisión de los Jurídico
del Senado para el P. del S. 2302, 23 de mayo de 2003,
pág. 5.

[11]Véase, D. Nevares-Muñiz, Código Penal del Estado
Libre Asociado, 2da. Ed. rev., San Juan, Instituto para
el Desarrollo del Derecho, 2005, pág.139.

**suficiente y no permitido originado por su conducta**". (Negrillas suplidas). D. Nevares-Muñiz, <u>Código Penal del Estado Libre Asociado</u>, 2da. Ed. rev., supra, 2005, pág. 139.

Paralelamente, la Profesora Dora Nevares-Muñiz, quien fuera la redactora principal del Código Penal de 2004, reseñó:

> Esta clase de asesinato, denominada en inglés <u>felony murder rule</u>, se interpretó bajo el Código Penal de 1974, como que sólo requiere establecer que la causa próxima de la muerte fue la comisión de uno de los delitos incluidos en el tipo legal o su tentativa.[…] Bajo los Códigos de 1902 y 1974 no era necesario traer prueba alguna de que el asesinato fue premeditado, deliberado y voluntario. Cuando tal era el caso se trataba de un asesinato en primer grado "por fuerza de ley". El elemento mental requerido bajo los Códigos de 1902 y 1974 era el del delito base.
>
> Sin embargo, **esta interpretación histórica varía en este nuevo Código. Se han introducido dos cambios.** Primero, **que se trate de un "verdadero asesinato subsumible en la definición del artículo [105] anterior; no cualquier muerte intencional por parte del sujeto".** Esto es, **no basta la intención de cometer el delito base, sino que ahora se requiere intención de causar la muerte,** ya que "asesinato" [...] se define como **"dar muerte a un ser humano con intención de causársela".**
>
> Segundo, ahora el asesinato estatutario **requiere que el asesinato se cometa como consecuencia natural de uno de los delitos base. <u>No basta que el delito base sea la causa próxima de la muerte, sino que es necesario que la comisión del delito base, o su tentativa constituya un riesgo considerable y típicamente relevante que se realice en el resultado. La muerte de una persona tiene que ser la consecuencia lógica o natural de la</u>**

> **consumación o tentativa del delito base**. Como indica el Informe de la Medida, P. del S. 2302, Comisión de lo Jurídico del Senado: "Solo entonces el asesinato aparece como realización de la peligrosidad propia de los delitos enumerados y no como consecuencia al azar" (Negrillas suplidas y citas omitidas). Íd., págs. 146-146.

**B.**

Si bien existe amplia jurisprudencia sobre el asesinato estatutario bajo los antiguos Códigos Penales de 1902 y 1974, fue en Pueblo en Interés del Menor ESMR, supra, **donde por primera vez se interpretó el asesinato estatutario del Art. 106 (b) del Código Penal de 2004** y, en particular, los elementos necesarios para que se configure esta modalidad de asesinato.

En esencia, en el caso antes citado se resolvió que la muerte de la víctima de robo se debió a una muerte casual (debido a los padecimientos cardiacos previos) **y que no estuvo presente la intención de matar como exige la definición de asesinato en el Código Penal, ni con el elemento de intención que requiere el Art. 106(b).** Por ello, se determinó que no se le podía imputar la falta por asesinato estatutario al menor ESMR.

Allí se mencionó que el Art. 106 tuvo un cambio transcendental en su redacción en comparación al Art. 83 del Código Penal de 1974. Entre varios asuntos, se determinó que el nuevo texto requería que la muerte **fuera un asesinato como consecuencia natural y no un incidente**

**casual en el transcurso de la consumación o tentativa del delito.**[12] En consecuencia, se expresó que, según sus términos, el inciso (b) del Art. 106 tuvo el efecto de convertir en asesinato de primer grado toda muerte intencional ocurrida como "consecuencia natural" de la comisión de uno de los delitos bases incluidos en el propio inciso.

Por otra parte, este Tribunal también expresó en su parte normativa que el asesinato, al requerir intención, "tiene que producirse ya sea como consecuencia natural de los actos del sujeto —no por el azar— o cuando su actuación contiene un riesgo conocido y aceptado por el sujeto que decide actuar, es decir, conoce la peligrosidad objetiva de su conducta". Íd., pág. 799. Como fundamento para esto, se razonó que la intención de un delito, según codificada en el Art. 23 del Código Penal de 2004, puede surgir:

> (a) cuando el hecho correspondiente ha sido realizado por una conducta dirigida voluntariamente a ejecutarlo [dolo directo de primer grado];
> (b) el hecho correspondiente es una consecuencia natural de la conducta voluntaria del autor [dolo directo de segundo grado o de consecuencias necesarias]; o
> (c) cuando el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de producir

_____

[12] Adviértase que este Tribunal llegó a dicha conclusión al considerar la enmienda propuesta bajo el P. de la C. 1625 que entre otras cosas proponía se enmendara el inciso (b) del Art. 106 para que incluyera al asesinato que se cometiera como consecuencia natural o incidental en el transcurso de la consumación o tentativa. Sin embargo, la propuesta no fue aprobada por la Asamblea Legislativa. Pueblo en Interés del Menor ESMR, supra, pág. 800.

el hecho delictivo realizado [dolo eventual o indirecto]. 33 LPRA ant. sec. 4651

Es decir, adviértase que el resultado de esto, fuese intencional o por inadvertencia, fue determinar que la intención para el delito de asesinato estatutario podía ocurrir bajo cualquiera de las tres (3) modalidades subjetivas del Art. 23 del Código Penal, a saber, dolo directo de primer grado, dolo directo de segundo grado o dolo eventual, lo que serían actualmente con propósito, con conocimiento o con temeridad.

Ello, precisamente, es la contención del Estado en este caso cuando argumenta que bastaba el dolo eventual o la temeridad en la que incurrieron los Recurridos para probar el elemento subjetivo requerido de intención. Sin embargo, como veremos, el alcance de este raciocinio fue criticado por antiguos compañeros de este Tribunal y ha sido igualmente reprochado por la Academia. A su vez, se aparta de la intención legislativa bajo el Código Penal de 2004.

**IV**

Como presagio a la controversia ante nos, en <u>Pueblo en Interés del Menor ESMR</u>, supra, la Jueza Asociada señora Fiol Matta emitió un voto concurrente en donde expresó que la opinión mayoritaria **no definió el elemento subjetivo de "consecuencia natural"** dispuesto en el Art. 106(b), **lo que ocasionó que no se precisara con claridad la naturaleza del**

**estado mental de intención exigido por el legislador.**[13] En particular, para la Jueza Asociada señora Fiol Matta la intención del legislador al redactar el delito de asesinato estatutario del Art. 106(b) requería que la muerte acaecida en la comisión de uno de los delitos bases fuera una muerte intencional o querida conforme la naturaleza según concebida en el inciso (b) del Art. 23 (o dolo de segundo grado). Sobre el particular, añadió lo siguiente:

> En otras palabras, ante los hechos imputados, el juzgador debía evaluar si en la comisión del delito grave, **el sujeto conocía que el resultado final se presentaría como una consecuencia necesaria o segura de su conducta. No bastaría con que se probara que el acusado hubiese querido realizar la conducta prohibida con conocimiento de que su conducta conllevaba un riesgo considerable y no permitido de producir la muerte conforme el inciso (c) [dolo eventual], sino que constituyera un "riesgo típicamente relevante".**
>
> **A otra interpretación no podríamos llegar.** El texto del Artículo 106(b) señala expresamente que el delito de asesinato estatutario se configura con que la muerte sea intencional como consecuencia natural de la comisión de uno de los delitos graves indicados o que el elemento subjetivo de intención sea como mínimo el correspondiente al dispuesto en el Artículo 23(b). Recordemos que los tribunales tenemos el deber de interpretar la ley de manera que se le dé sentido lógico a sus disposiciones y el deber de descubrir la función para la cual fue creada la ley. Además, en materia de derecho penal los estatutos tienen que interpretarse restrictivamente y no se permite hacer caso omiso a la evidente intención del legislador. Íd., págs. 812-813.

---

[13]Véase, <u>Pueblo en Interés del Menor ESMR</u>, supra, Voto concurrente de la Jueza Asociada señora Fiol Matta al cual se unió el Juez Presidente Señor Hernández Denton.

En palabras de la Jueza Fiol Mata, bajo el Art. 106(b) no se podría sancionar penalmente a una persona por una muerte acontecida durante la perpetración de uno de los delitos graves, a menos que se probara que tuvo la **intención de causar la muerte o sabía con alta probabilidad que la misma sería un resultado seguro de sus actos**. Íd., pág. 813. Por ello, enfatizó que bajo el inciso (b) del Art. 23 no se puede concebir una mera posibilidad, sino una alta probabilidad del resultado.

Similarmente, el Profesor Zambrana González nos comenta que el lenguaje utilizado de consecuencia natural de la consumación o de la tentativa apunta a que el requisito de imputación al tipo subjetivo **era el de dolo directo de primer grado y segundo grado (con propósito y con conocimiento en la terminología vigente**). A. Zambrana González, <u>Análisis dogmático-penal del asesinato estatutario y su normatividad en Puerto Rico</u>, 92 Rev. Jur. U.P.R. 21, 70 (2023).[14] Esto ya que "el autor del asesinato

---

[14]A su vez, para el Profesor Zambrana González, en virtud del Art. 23 del Código Penal de 2004, como mínimo, el resultado típico de asesinato estatutario debía realizarse mediante dolo directo de segundo grado, "lo que excluía por lógica, la posibilidad dogmática que el resultado típico pudiera realizarse mediante dolo eventual (con temeridad), bajo la referida disposición de imputación al tipo subjetivo". Íd., esc. núm. 259. Por ello nos invita a cuestionarnos el por qué seguir tipificando esta modalidad tan problemática de asesinato estatutario, si como quiera ya la realización de la muerte mediante dolo directo de primer o segundo grado se clasifica como asesinato de primer grado. Íd.(cita omitida).

**debía ser consciente de que la generación del peligro desaprobado,** concretizado en la realización de un delito base o su tentativa, **como mínimo produciría de forma (casi) segura la muerte de una persona**". (Negrillas suplidas). Íd.

Por ello, el Profesor Zambrana González **explicó que en Pueblo en Interés del Menor ESMR,** supra, **la Opinión mayoritaria erró al expresar que la modalidad de asesinato estatuario podía cometerse mediante cualquier forma de dolo, incluyendo el dolo eventual.** Lo anterior, porque "si el autor debe ser consciente de que el resultado típico tiene que ser una consecuencia natural de la comisión o tentativa del delito base, entonces no existiría lugar para una forma dolosa menor a la de dolo directo de segundo grado", cuyo lenguaje en el Art. 23(b) así lo distinguía. Íd., pág. 73.[15]

---

[15]Resulta también pertinente a la controversia el análisis que hace el Profesor Zambrana González sobre los autores y coautores ante el principio de responsabilidad penal, cobijado actualmente en el Art. 8 del Código Penal de 2012, 33 LPRA sec. 5008 (Art. 22 del Código de 2004, 33 LPRA ant. sec. 46) y el principio de personalidad en el actual Art. 6 del Código Penal de 2012, 33 LPRA sec. 5006. ("Como mínimo, **el coautor debe tener dominio del hecho. Puede ser coautor o partícipe del delito base, pero no necesariamente del asesinato de un sujeto mientras se cometía o intentaba cometer ese tipo penal.** Tanto un autor como cooperador deben tener conocimiento del hecho típico por el cual se les imputa un grado de culpabilidad. Bajo el ordenamiento penal actual, casos como los del agente del orden público que dispara en cumplimiento de un deber y le provoca accidentalmente la muerte a una víctima de robo, por ejemplo, no podrían dar paso a la configuración del asesinato estatutario). L.A. Zambrana González, op.

Por su parte, en su ponencia ante la Comisión de lo Jurídico del Senado para evaluar el P. del S. 2302, el Profesor Luis E. Chiesa Aponte sostuvo que el Código propuesto alteraba la tradición anglosajona con respecto al delito de asesinato, ya que incluía muchos elementos de corte continental.[16] En particular, expuso que el Art. 106 (b) **eliminaba la doctrina clásica de asesinato estatutario** al establecer en el inciso (b) que **sólo las muertes que ocurren como consecuencia natural de alguno de los delitos bases subyacentes clasificarían para ser consideradas asesinatos en primer grado.**

En lo aquí pertinente, comentó el Profesor Chiesa Aponte que **esto tendría poco sentido**, ya que desde el punto de vista de política criminal **debería bastar para que se considere asesinato en primer grado que la muerte se haya producido con dolo eventual**, es decir, como consecuencia probable del acto y con indiferencia a la producción del resultado lesivo. Íd. Dicho de otro modo, al Profesor Chiesa Aponte le preocupó que al requerirse que la muerte fuese el resultado de una consecuencia

---

cit, pág. 45. Véanse, <u>Pueblo v. Rivera Torres</u>, 121 DPR 128 (1988); <u>Pueblo v. Calderón Laureano</u>, 113 DPR 574 (1982).

[16]Ponencia del Profesor Chiesa Aponte sobre el P. del S. 2302 del Nuevo Código Penal del Estado Libre Asociado de Puerto Rico, 23 de mayo de 2003, pág. 19; P del S. 2302: Ley Núm. 149 de 18 de junio de 2004, Código Penal de Puerto Rico, Pt. II, Sec. B, Núms. 1-19 Miscelánea. En específico, destacó que la doctrina se derivaba de la obra penalista del alemán Jescheck. Íd., pág. 10.

natural, se eliminara la posibilidad de que se incurriera en el elemento subjetivo del delito mediante el dolo eventual bajo el inciso (c) del Art. 23 del Código Penal de 2004 ("cuando el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado"), o temerariamente en el ordenamiento actual.[17]

Asimismo, con respecto al término de dolo directo de segundo grado, comentó que el uso de consecuencia natural en lugar de consecuencia necesaria obedece a que lo necesario conlleva certeza matemática y que de eso no se habla en el derecho penal, sino de consecuencias que suelen surgir en el curso natural de los eventos.[18] En particular, no basta que el autor sea consciente de que existe alguna probabilidad de que su acción producirá el hecho delictivo para que se considere que actuó con conocimiento, **sino que se requiere además que el autor haya previsto que existía una alta probabilidad de que se realizaría la conducta prohibida e incluso**

---

[17]Nótese que en el Código Penal de 2012, la enmienda mediante la Ley Núm. 246-2014, modificó la definición de asesinato en su Art. 92. ("Asesinato es dar muerte a un ser humano a propósito, con conocimiento o temerariamente". 33 LPRA sec. 5141.

[18]Ponencia del Profesor Chiesa Aponte sobre el P. del S. 2302 del Nuevo Código Penal del Estado Libre Asociado de Puerto Rico, 23 de mayo de 2003, pág. 10; P del S. 2302: Ley Núm. 149 de 18 de junio de 2004, Código Penal de Puerto Rico, Pt. II, Sec. B, Núms. 1-19 Miscelánea. Íd., pág. 10.

pudiera decirse que un sujeto actúa "con conocimiento" **solamente si es consciente que su conducta genera una probabilidad extremadamente alta** de producir un hecho delictivo, puesto que solamente en estos casos puede decirse que la producción del hecho delictivo es una **"consecuencia natural o necesaria"** de la conducta del actor. (Negrillas suplidas). Luis E. Chiesa Aponte, Derecho Penal Sustantivo, 2da. Ed., Estados Unidos, Publicaciones JTS, 2013, pág. 155.[19]

Aún más importante, en el Informe sobre el P. del S. 2302 que la Comisión de lo Jurídico presentó a la Cámara de Representantes se indicó que

el Artículo 23 (Intención) se restituye en el inciso (b) el término consecuencia "necesaria" por consecuencia "natural". Este cambio fue recomendado por el Prof. Ernesto Chiesa en su ponencia escrita; **además, es consistente con el término utilizado en el Artículo 106 en referencia al asesinato estatutario**…(Negrillas suplidas). Informe de la Comisión de lo Jurídico sobre el P. del S. 2302 a la Cámara de Representantes del 28 de abril de 2024, pág. 21.

Nótese, que la Asamblea Legislativa al momento de redactar el Código Penal de 2004 creó de manera intencionada una relación entre el Art. 106 (b) y el Art. 23 (b) del Código Penal de 2004 (dolo directo de segundo grado o con conocimiento).

**V**

Como cuestión de umbral, debo reseñar que me resulta desacertado, incluso peligroso, que tanto el Estado como

---

[19]Véase también, Luis E. Chiesa Aponte, Derecho Penal Sustantivo, Estados Unidos, Publicaciones JTS, 2007, págs. 146-147.

algunos de mis compañeros de estrado recurran de forma ilustrativa o persuasiva a jurisprudencia resuelta bajo Códigos Penales inaplicables como el de 1974.[20] Como vimos, y muy contrario al Código Penal de 2004, en tal Código la imputación del tipo objetivo se realizaba mediante la teoría de causa próxima y **solo** requería establecer que la causa próxima de la muerte fue la comisión de uno de los delitos base o su tentativa. Esta norma sufrió un cambio transcendental con el Código Penal de 2004, lo que me fuerza a concluir que tal jurisprudencia no es vinculante o pertinente en este caso.

Así, por ejemplo, el argumentar reiteradamente que los Recurridos "pusieron en marcha una sucesión de eventos" que desembocó en la muerte de uno de los coautores es, desde mi punto de vista, un intento de recurrir a la descartada teoría de causa próxima, donde prácticamente aquel que iniciaba un acto criminal respondía por todas

---

[20]Para una crítica respecto a la figura del asesinato estatutario y sus implicaciones constitucionales por violación a la cláusula constitucional contra castigos crueles e inusitados, presunción de inocencia y conflicto con los principios normativos de autolimitación como los de culpabilidad, proporcionalidad, adecuacidad y responsabilidad personal, véanse, A. Zambrana González, op. cit.; M. Gómez Guerrero, op. cit. ("Es absurdo sostener la responsabilidad criminal de una persona por el trágico e imprevisto resultado producido por las actuaciones de un tercero…Toda la casuística ha demostrado que el asesinato estatutario se ha interpretado en beneficio del estado y en completo menosprecio de los derechos constitucionales de los acusados por dichos delitos."). Íd., pág. 237.

las posibles consecuencias de sus actos. Recordemos que bajo la pasada jurisprudencia no se le requería al Estado demostrar algún elemento subjetivo doloso con respecto a la muerte de la persona.[21]

Sin embargo, bajo el Código Penal de 2004 **aplicable a la controversia de autos**, el Estado debía demostrar, más allá de duda razonable, que la muerte se trató de un verdadero asesinato en virtud del Art. 105 del Código Penal de 2004, es decir, que hubo la intención de causar su muerte y no solamente de cometer el delito de robo. Además, tenía que probar que el asesinato ocurrió como consecuencia natural, o como hemos visto, que se trató de un resultado con alta probabilidad de ocurrir.

Por otra parte, el Estado, así acogido por algunos miembros de este Tribunal, afirma que basta el dolo eventual o la temeridad para que se configure el elemento subjetivo de intención de asesinar en este caso. Para ello argumenta que en Pueblo en Interés del Menor ESMR, supra, se expresó que la intención en virtud del Art. 23 del Código Penal de 2004 se da en tres (3) modalidades distintas y que "[p]or lo tanto, el asesinato, al requerir intención, tiene que producirse ya sea como consecuencia

---

[21]Cf., L.A. Zambrana González, op. cit. Para el Profesor Zambrana González los cambios introducidos en el Art. 106(b) del Código Penal de 2004 fueron tan sustanciales que considera que muchos de los condenados en la jurisprudencia bajo los Códigos Penales de 1902 y 1974 no hubiesen podido serlo a la luz del estatuto equivalente en el Código Penal de 2004.

natural de los actos del sujeto -no por el azar- o cuando su actuación contiene un riesgo conocido y aceptado por el sujeto que decide actuar, es decir, conoce la peligrosidad objetiva de su conducta". Íd., pág. 799. Por ello sostienen que vasta el dolo eventual para demostrar la intención de asesinar del Art. 106 (b) del Código Penal de 2004.[22]

Desde mi punto de vista, y como muy bien argumentó en la vista oral la Profesora Iris Y. Rosario Nieves, representante legal de los Recurridos, esa expresión en Pueblo en Interés del Menor ESMR, supra, no solo está sacada de contexto, sino que también se aparta de las conclusiones de tratadistas y expertos del Derecho penal y el alcance de lo allí resuelto. Como bien reseñé, tanto el Profesor Zambrana González como el Profesor Chiesa Aponte concluyeron que al Art. 106 (b) del Código Penal de 2004 hablar de las muertes ocurridas como consecuencia natural en la consumación o tentativa de los delitos bases, este eliminaba la posibilidad de que el elemento subjetivo de intención se demostrara con dolo eventual o con temeridad. Véase, Zambrana González, Análisis dogmático-penal del asesinato estatutario y su normatividad en Puerto Rico, 92 Rev. Jur. U.P.R. 21, 70-

---

[22]Se distingue que el Código Penal de Puerto Rico de 2012, la enmienda mediante la Ley Núm. 246-2014, modificó la definición de asesinato en su Art. 92. ("Asesinato es dar muerte a un ser humano a propósito, con conocimiento o temerariamente". 33 LPRA sec. 5141.

73 (2023); Ponencia del Prof. Luis E. Chiesa Aponte sobre el P. del S. 2302 del Nuevo Código Penal del Estado Libre Asociado de Puerto Rico, 23 de mayo de 2003, pág. 19; P del S. 2302: Ley Núm. 149 de 18 de junio de 2004, Código Penal de Puerto Rico, Pt. II, Sec. B, Núms. 1-19 Miscelánea.

A su vez, adviértase que por los hechos que se suscitaron en Pueblo en Interés del Menor ESMR, supra, el análisis de este Tribunal se detuvo en la imputación objetiva, pues se determinó que la muerte había sido casual debido a las condiciones de salud previas de la víctima. Como resultado, y como invitó a hacer la Jueza Asociada señora Fiol Matta, en aquel momento el Tribunal no se embarcó en el análisis de imputación subjetiva requerida. Por lo tanto, contrario a la pretensión del Estado y de algunos compañeros de este Tribunal, la referida oración no creó un precedente y mucho menos tiene el alcance aquí pretendido de que basta temeridad o dolo eventual para que se configure el elemento de intención.

Así las cosas, y retomando la médula de la controversia, bajo el Código Penal de 2004 el asesinato es dar muerte a un ser humano con la intención de causarla. 33 LPRA ant. sec. 4733. La intención es un elemento de hecho a ser determinado por el juzgador de hechos **atendiendo los hechos, actos y circunstancias que rodean a la muerte, la capacidad mental, motivación,**

**manifestaciones y conducta de la persona, y luego de esta evaluación inferir si hubo la intención de matar o no.** (Negrillas suplidas). D. Nevares-Muñiz, Código Penal del Estado Libre Asociado, 2da. Ed. rev., supra, 2005, pág. 136; Pueblo v. Ortiz Rodríguez, 100 DPR 972, 979 (1972).

De igual forma, enfatizo que con la adopción del Código Penal de 2004 **no** basta que el delito base sea la causa próxima de la muerte, sino que es necesario que la consumación del delito base o su tentativa constituya un riesgo típicamente relevante que se realice en el resultado. D. Nevares-Muñiz, Código Penal del Estado Libre Asociado, 2da. Ed. rev., supra, 2008, pág. 147. Por ello, se dispone que la muerte de la persona tiene que ser una **consecuencia** lógica o **natural** de la consumación o tentativa del delito base. Íd. En otras palabras, y según discutido, para que se pueda encontrar culpable a una persona por asesinato estatutario se tiene que probar que tuvo la intención de causar la muerte y que **conocía con alta probabilidad que la muerte sería el resultado casi seguro de sus actos.**

Por ello, la pregunta ante nos es si a partir de los hechos tan particulares de este caso, al momento de consumar o intentar consumar el delito de robo, el señor Díaz Fontánez y el señor García Cartagena tuvieron la intención de asesinar a una persona o si sabían que con alta probabilidad la muerte del coautor Feliciano Rivera

sería el resultado casi seguro de sus actos. Al igual que el foro intermedio, respondo en la negativa. Por ello mi conformidad.

Y es que tanto una lectura sosegada del expediente como de un análisis ecuánime de las argumentaciones de las partes, se desprende que el Tribunal de Apelaciones no cometió el error señalado por el Estado. Esto es, que no se apartó de lo expresado en Pueblo en Interés del Menor ESMR, supra, o incurrió en errores conceptuales. La determinación del foro intermedio se fundamentó, principalmente, en que de conformidad con el Art. 106 (b) del Código Penal de 2004 y con lo expresado en Pueblo en Interés del Menor ESMR, supra, se requiere que la muerte sea un asesinato y que ocurra como consecuencia natural durante la consumación o tentativa del delito base. Por ello, resolvió que hubo insuficiencia de prueba para demostrar más allá de duda razonable el elemento de intención del Art. 106 (b) del Código Penal de 2004. Veamos.

En cuanto al **concepto de intención,** la Profesora Nevares-Muñiz expresó que **"[n]o puede llamarse intencional un hecho no querido por su autor, como lo pretend[ía] el Artículo 15b del Código Penal de Puerto Rico [1974]** ("cuando el resultado sin ser querido ha sido provisto por su autor"). La intención implica algún modo de "**querer**". En la doctrina actual, hay dos (2) formas de "querer": el

querer como manifestación de un deseo dirigido a la consecución de un hecho, y el querer como aceptación del hecho.[23]

No tengo duda que en este caso el expediente está huérfano de prueba tendente a demostrar la tipicidad del Art. 106 (b) del Código Penal de 2004 para que se pueda concluir que los Recurridos tuvieron la intención de causarle la muerte al señor Feliciano Rivera y que su muerte ocurrió como una consecuencia natural. Contrario a lo expresado por la Opinión disidente, la prueba a lo sumo demostró otros delitos que no están aquí en controversia como la conspiración, el robo o su tentativa. Nada más. Por ello, el resultado de este caso no es dejar impunes a los Recurridos como sostienen los disidentes, puesto que llevan más de once (11) años reclusos.[24] Sino que este caso

---

[23] Ponencia de la Dra. Dora Nevares Muñiz y la Lcda. Rosa Noemí Bell Bayrón sobre el P. del S. 2302 del Nuevo Código Penal del Estado Libre Asociado de Puerto Rico, 21 de mayo de 2003, pág. 3, P del S. 2302: Ley Núm. 149 de 18 de junio de 2004, Código Penal de Puerto Rico, Pt. II, Sec. B, Núms. 1-19 Miscelánea.

[24] El señor García Cartagena, fue sentenciado a noventa (90) días por infracción al Art. 249 (conspiración), noventa y nueve (99) años por infracción al Art. 106(b) (asesinato estatutario), y dos (2) años y nueve (9) meses por la tentativa al Art. 198 del Código Penal del 2004. Por su parte, el señor Díaz Fontánez fue sentenciado a noventa (90) días por infracción al Artículo 249 (conspiración), noventa y nueve (99) años por el Art. 106(b) (asesinato estatutario), dos (2) años y nueve (9) meses por tentativa al Art. 198 de Código Penal del 2004 y un (1) año por el Art. 5.04 de la Ley de Armas de Puerto Rico.

trata de reconocer la responsabilidad penal de una persona si en Derecho le corresponde.

A pesar de lo anterior, el Estado y los disidentes insisten en que los Recurridos tuvieron la intención de adquirir originalmente un arma de fuego real, lo aquí material es que **no** la consiguieron y el señor Feliciano Rivera, quien finalmente resultó muerto, entró a asaltar la joyería con un arma de juguete. Ante ello, enfatizo que se debe evaluar si los Recurridos, como coautores en este caso, tenían en su estado mental la intención de asesinar a un ser humano, a saber, otro coautor. O, en otras palabras, si el señor Díaz Fontánez y el señor García Cartagena, cuando decidieron continuar con el plan de robo utilizando un arma de juguete, podían prever con alta probabilidad que la comisión del robo o su tentativa tendría como consecuencia natural o casi segura la muerte de un ser humano.

El distinguir esto es importante, porque tanto el Estado como los disidentes enfatizan que era lógico que la víctima del robo, ante la violencia y amenaza recibida durante el atraco, defendería su propiedad con el arma para la cual tenía licencia y ello resultara en una muerte. Sin embargo, considero que todo esto, a lo sumo, demuestra una actuación en legítima defensa, como causa de exclusión de responsabilidad penal mediante la cual la víctima intentó repeler el robo, mas no puede tener el alcance

pretendido de transferir a los Recurridos la intención de causar un asesinato por medio de una teoría implícita de causa próxima y en aparente contradicción al texto claro de los Arts. 105 y 106 (b) del Código Penal de 2004.

Abona a mi postura que del propio testimonio del testigo de cargo y coautor señor Carrasquillo Castillo surgió lo siguiente:

> Sobre el disparo, no sabe quién lo hizo. En cuanto a la pistola, dijo que era tan de mentira, que se le rompieron unos cantitos pequeños cuando la probaba. Dijo que no se siente responsable por la muerte del señor Feliciano Rivera. El Tribunal de Primera Instancia permitió a la defensa preguntar si era justo que mataran a un joven que usaba una pistolita de plástico y el señor Carrasquillo Castillo respondió no. En cuanto al robo, dijo que no sabe si se rompieron vitrinas en la joyería porque no alcanzó a mirar. **No pudieron robar porque hubo un disparo. Y jamás pensó que eso pudiese pasar**. Aunque hubo tristeza en el barrio, él no volvió a hablar con los demás que planificaron el robo.
> En el redirecto del Ministerio Público, el señor Carrasquillo Castillo **dijo él y los demás fueron "[a] robar, asaltar"**. Se supone que lo robado sería vendido por el señor **Díaz Fontánez** y Saúl[sic] **para después repartirlo en partes iguales. No lo lograron** por el forcejeo entre Carlos y el señor de la joyería, seguido **por el disparo**. Explicó que respondió a la defensa que no [se] sentía responsable de la muerte del señor Feliciano Rivera, ya que **"pa' mi entender nosotros no fuimos allí a matar a nadie ni na", pero se siente mal y dolido por la muerte de este porque era su amigo**. Igualmente, se sintió mal por el joyero, quien no tiene la culpa, **ya que ellos fueron a asaltar y este se defendió**.[25]

---

[25]Extracto del testimonio del señor Carrasquillo Castillo, <u>Petición de Certiorari</u>, págs. 28-29.

En este caso, no tengo duda de que al Art. 106(b) del Código Penal de 2004 exigir el elemento de "consecuencia natural" le impuso al Estado la obligación de demostrar más allá de duda razonable que no solo se ocasionó una muerte durante la consumación o la tentativa del delito base, sino que además los aquí Recurridos actuaron con el conocimiento de que su conducta generaría con probabilidad extremadamente alta la muerte del señor Feliciano Rivera al realizarse el robo. Como vimos, la normativa fue clara en que se exige un verdadero asesinato con la intención de causar la muerte y no cualquier muerte incidental o casual.

Además, al reflexionar sobre la intención legislativa del Art. 106 (b) del Código Penal de 2004, se dijo que

> [p]arecería que el propósito fundamental de la figura del asesinato estatutario, según redactado en el Código Penal de 2004, fue persuadir al criminal para que no asesine a sus víctimas mientras comete alguno de los delitos base. Esto, pues, castiga más severamente aquellos asesinatos cometidos mientras se comete o intenta cometer ciertos delitos que son inherentemente peligrosos por la vulnerabilidad en la cual se encuentran sus víctimas, por lo que busca protegerlas. El legislador pretendió castigar de forma más severa al delincuente que mientras comete uno de estos delitos asesine a sus víctimas, en contraste con aquellos que únicamente cometen el delito. Pueblo en Interés del Menor ESMR, págs. 802-803.

A la luz de todo esto, y al igual que resolvió el foro apelativo intermedio, en la comisión o tentativa del robo perpetrado por los Recurridos **no estuvo presente la**

**intención de dar muerte a un ser humano como exige la definición de asesinato en el Código Penal de 2004 y esta no ocurrió como consecuencia natural según requiere el Art. 106(b) el Código Penal de 2004**. Por todo ello, estoy conforme con que, tras este Tribunal estar igualmente dividido, se confirme la <u>Sentencia</u> recurrida, la cual, entre otras cosas, anuló la convicción de asesinato estatutario de los Recurridos.

## VI

Por último, quisiera señalar que la controversia de autos ejemplifica cómo la celebración de vistas orales contribuye a tomar una decisión más ponderada. Como muy bien expresó la Profesora Iris Y. Rosario Nieves en su alocución, el asesinato estatutario genera debate porque el legislador lo ha modificado en cuatro (4) ocasiones distintas y con ello ha alterado la estabilidad y compresión jurídica de una figura ya, de por sí, compleja.

Consecuentemente, he llamado la atención a esta situación cuando aún en asuntos de alto interés público que han requerido la necesidad de redefinir los contornos de garantías constitucionales se le niega a una parte la solicitud. Véase, <u>Pueblo v. Bonilla Rosado</u>, 210 DPR 980, 988 (2022) (Opinión disidente del Juez Asociado señor Estrella Martínez). Aspiro a un mayor reconocimiento de que en las vistas orales se atienden las preocupaciones particulares de cada miembro de este Tribunal, lo que

repercute en nutrir el análisis de las controversias a resolverse y además es un excelente ejercicio pedagógico para la comunidad jurídica y la comunidad en general.


                              Luis F. Estrella Martínez
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>José García Cartagena<br><br>Recurrido<br>_____<br><br>El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Víctor J. Díaz Fontánez<br><br>Recurrido | CC-2023-0136 | *Certiorari* |

**El Juez Asociado señor Rivera García emitió una Opinión Disidente a la cual se une el Juez Asociado señor Martínez Torres, la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Kolthoff Caraballo**

En San Juan, Puerto Rico, a 10 de junio de 2024.

Este caso nos brindaba la oportunidad de abundar sobre lo que correctamente establecimos en *Pueblo en Interés del Menor ESMR,* 189 DPR 787 (2013), respecto a la figura del delito de asesinato estatutario bajo el derogado Código Penal de 2004, *infra,* y, además, nos ofrecía espacio para elaborar sobre los elementos subjetivos de intención, particularmente, aquellos que no requieren un objetivo consciente y voluntariamente deseado.

Lamentablemente, una vez más, este Tribunal se divide y no alcanza una determinación mayoritaria, dando paso a la

confirmación de un dictamen que, bajo mi criterio, es patentemente incorrecto. La conclusión del Tribunal de Apelaciones parece sugerir que la figura del asesinato estatutario, procede única y exclusivamente cuando se tiene intención directa de asesinar. Así, pierde de perspectiva que, además, los delitos se consideran cometidos con intención cuando media temeridad en los actos del sujeto o cuando existe conocimiento —*dolo de segundo grado*— y era previsible el resultado. Precisamente, sobre este último grado de intención, es que debimos expresarnos y dejar meridianamente claro cuáles eran las implicaciones del inciso (b) del Art. 23 del Código Penal del 2004, respecto a la intención criminal que se produce cuando **el hecho correspondiente es una consecuencia natural de la conducta voluntaria del autor**.

Así, pues, me hago eco de las palabras que pronunciáramos en *Pueblo v. Calderón Laureano*,[1] que, aunque se hicieron bajo un marco jurídico diferente, son perfectamente aplicables al razonamiento de esta controversia, toda vez que "no es necesario mucho esfuerzo mental para comprender que al efectuarse un robo —*debido al interés natural de la víctima de proteger su persona y bienes*— el asaltante razonablemente ha previsto o puede prever que la consecuencia natural o probable de su acción puede desembocar en la muerte de **alguna persona**".

---

[1] 113 DPR 574, 580 (1982).

En vista de que los antecedentes fácticos del presente caso son muy particulares, procedo a consignarlos de manera sucinta a continuación.

## I.

Por hechos ocurridos el 4 de agosto de 2010, el Ministerio Público presentó varias denuncias en contra de los Sres. José García Cartagena y Víctor J. Díaz Fontánez (en conjunto, recurridos). Particularmente, se les imputó haber cometido los delitos siguientes: asesinato estatutario, conspiración, tentativa de robo[2] y portación y uso de armas de fuego sin licencia.[3]

Luego de superar las instancias preliminares del cauce criminal, se celebró el juicio en su fondo entre los meses de marzo y junio de 2012. Cabe señalar que el juicio se celebró ante un Jurado.

De la prueba presentada en sala, surgió que allá para el 3 de agosto de 2010, los recurridos, junto a otros coautores, se reunieron e idearon un plan para robar la Joyería San José, la cual estaba localizada en el municipio de San Lorenzo.[4] La intención de robar la joyería antes mencionada respondió a que el comercio era atendido por el Sr. José Muñoz Aponte, presuntamente una persona débil y de edad avanzada, por lo que, según los conspiradores, sería

---

[2] Art. 106 (b), 249 y 198 del Código Penal de 2004, 33 LPRA ant. secs. 4826, 4832 y 4877, respectivamente.
[3] Art. 5.04 de la entonces vigente *Ley de Armas de Puerto Rico*, Ley Núm. 404-2000, según enmendada, 25 LPRA ant. sec. 458 (c).
[4] Apéndice del recurso, Transcripción de la prueba oral págs. 554-559.

fácil de dominar. Además, se mencionó que los atracadores intentaron conseguir un arma de fuego para cometer el crimen, sin embargo, sus esfuerzos por adquirir una resultaron infructuosos, por lo que decidieron comprar un arma de juguete que pareciera y tuviera las características de un arma de verdad.[5] Asimismo, el acuerdo era que cuando entraran a la joyería, tenían que quitarle el "beeper" al señor que atendía, amarrarlo y encerrarlo en un cuarto que había adentro.

De igual forma, la prueba estableció que el 4 de agosto de 2010, día en que se cometió el robo, cuando los asaltantes llegaron al negocio, se percataron de que la persona que estaba atendiendo no era una persona fácil de dominar, sino que era un hombre fuerte y saludable. A pesar de ello, decidieron cometer la fechoría porque ya estaban allí y, pues, "eso era meterse rápido y ya".[6]

Así las cosas, el Sr. Carlos Feliciano Rivera, uno de los coautores, entró a la joyería con el revólver y forcejeó con el señor Muñoz Aponte. Acto seguido, lo golpeó en el rostro y le hirió la boca. Asimismo, lo encañonó y le solicitó en reiteradas ocasiones que abriera la puerta para que los otros compañeros entraran. Ante este reclamo, el señor Muñoz Aponte introdujo la mano en su bolsillo y cuando sacó las llaves y el *beeper* para abrir la puerta, fue empujado por el señor Feliciano Rivera, por lo que las llaves y al *beeper* cayeron a un lado del suelo. En ese

---

[5] Íd.
[6] Íd., págs. 580-582.

mismo instante, el señor Muñoz Aponte ingresó nuevamente su mano en el bolsillo, sacó una pistola para la cual tenía licencia, e hizo un disparo que hirió mortalmente a uno de los coautores. Eventualmente, uno de los participantes del robo realizó una confesión y se logró el arresto de los demás involucrados.

Así las cosas, el 29 de junio de 2012, el Jurado rindió sus veredictos. En lo que concierne al señor García Cartagena, el Jurado emitió el siguiente veredicto:

a. En cuanto al delito de conspiración, fue encontrado culpable por unanimidad.
b. Respecto a la tentativa de robo imputada, fue encontrado culpable por mayoría de 11-1.
c. En cuanto al asesinato en primer grado, fue encontrado culpable por mayoría 10-2.
d. En el cargo de portación y uso de armas de fuego sin licencia, el veredicto fue de no culpabilidad.

Respecto al señor Díaz Fontánez, el Jurado emitió el siguiente veredicto:

a. En cuanto al delito de conspiración, fue encontrado culpable por unanimidad.
b. Respecto a la tentativa de robo, fue encontrado culpable por unanimidad.
c. En cuanto al delito de asesinato en primer grado, el veredicto de culpabilidad fue por mayoría 11-1.
d. Respecto a la portación y uso de armas de fuego sin licencia, fue encontrado culpable por mayoría 9-3.

Consecuentemente, el 6 de septiembre de 2012, el Tribunal de Primera Instancia dictó las correspondientes *Sentencias*.

Luego de varios años, específicamente en el 2020, los recurridos presentaron mociones de nuevo juicio al amparo de la Regla 192.1 de Procedimiento Criminal,[7] bajo la alegación de falta de diligencia de su entonces representación legal para apelar. El tribunal primario las declaró con lugar y dejó sin efecto las *Sentencias* emitidas el 6 de septiembre de 2012. Así las cosas, durante los días 14 de enero y 28 de junio de 2021, se realizaron los nuevos actos de *Lectura de Sentencia* en contra de los recurridos.[8]

Inconformes, los recurridos presentaron oportunamente y ─*por separado*─ recursos de Apelación ante el Tribunal de Apelaciones y esbozaron que el cargo por asesinato estatutario no se probó más allá de duda razonable y que les era de aplicación la nueva norma adoptada en *Ramos v. Lousiana*, 590 US 83 (2020), relacionada a la unanimidad en veredictos de culpabilidad.

Así las cosas, el 7 de noviembre de 2022, el foro intermedio notificó una *Sentencia* en virtud de la cual revocó el dictamen del tribunal primario respecto al asesinato en primer grado, en la modalidad de asesinato estatutario, tras razonar, en lo pertinente, lo siguiente:

> "[L]os aquí apelantes **nunca tuvieron la intención de matar**, elemento requerido por el Art. 106(b) del Código Penal del 2004 y lo

---

[7] 34 LPRA Ap. II.
[8] En lo que respecta al señor García Cartagena, fue sentenciado a noventa (90) días por infracción al Artículo 249, noventa y nueve (99) años por infracción al Art. 106(b), y dos (2) años y nueve (9) meses por la tentativa al Art. 198 del Código Penal del 2004. Por su parte, el señor Díaz Fontánez fue sentenciado a noventa (90) días por infracción al Artículo 249, noventa y nueve (99) años por el Art. 106(b), dos (2) años y nueve (9) meses por tentativa al Art. 198 del Código Penal del 2004 y un (1) año por el Art. 5.04 de la *Ley de Armas de Puerto Rico*.

resuelto en *Pueblo en Interés del Menor ESMR*, supra. Por otro lado, la muerte del coautor del delito, Carlos Feliciano Rivera, a manos de la víctima del asalto tampoco fue un asesinato, **por carecer de la intención de matar conforme exige la definición de asesinato del Código Penal de 2004**.

Por lo anterior, concluimos que la prueba presentada por el Ministerio Publico resultó insuficiente para configurar contra los aquí apelantes el elemento de intención requerido para el delito de asesinato estatutario, según tipificado en el Art. 106 (b) del Código Penal del 2004".

Insatisfecho, el 24 de febrero de 2023, el Procurador General presentó un recurso de *Certiorari* ante nos, y planteó lo siguiente:

El Tribunal de Apelaciones cometió un craso error de derecho al revocar la [condena] de los recurridos por el delito de asesinato estatutario bajo el Código Penal de 2004[,] al entender que únicamente podía incurrirse en el delito de asesinato estatuario si se demuestra la intención directa de ocasionarle la muerte a una persona e ignorar los otros escenarios del elemento de la intención reconocidos expresamente en el Código Penal y en *Pueblo En Interés del Menor ESMR*, 189 DPR 787 (2013).

Luego de varios trámites procesales, expedimos el caso en segunda reconsideración. Las partes presentaron sus correspondientes alegatos y el 30 de abril de 2024 celebramos una *Vista Oral*.

Así, pues, en vista de que contamos con el beneficio de la comparecencia tanto escrita como oral de ambas partes, procedo a elaborar el razonamiento de mi postura.

**II.**

**A. Asesinato estatutario bajo el Código Penal 2004**

La figura del asesinato estatutario, proveniente del derecho común angloamericano, ha estado instituida en nuestro derecho penal desde hace ya varias décadas. La incorporación y la subsistencia de esta figura ha respondido a una fuerte y constante política pública que busca disuadir y penalizar con mayor severidad a las personas que al cometer lo que conocemos como el delito base, con sus acciones coetáneas, contribuyen u ocasionan la muerte a un ser humano.

Las particularidades de esta figura, fueron recogidas de manera acertada en *Pueblo En Interés del Menor ESMR*, 189 DPR 787 (2013), particularmente, en el contexto sustantivo del Código Penal del 2004. Si bien no pretendo duplicar lo que en dicha ocasión correctamente pronunciamos, estimo necesario apuntalar varios aspectos de la doctrina general de esta figura dentro del marco legal provisto por el Código Penal de 2004.

En lo pertinente al caso de autos, el Art. 106 del Código Penal de 2004, codificó el delito de asesinato estatutario de la manera siguiente:

> (a) [...]
>
> (b) **Todo asesinato que se comete como <u>consecuencia natural</u> de la consumación o tentativa de algún delito de** incendio agravado, agresión sexual, **robo**, escalamiento agravado, secuestro, secuestro de un menor, estrago, envenenamiento de aguas de uso público, agresión grave en su modalidad mutilante, fuga, maltrato intencional o abandono de un menor.
>
> (c) [...]. (Énfasis suplido)

Como sabemos, el Código Penal del 2004 introdujo varios cambios a la manera en que estaba redactado el delito de asesinato estatutario, de manera tal, que se sustituyó la palabra "muerte" por "asesinato". En ese sentido, resulta indispensable acudir al Artículo 105 del Código Penal del 2004 para encontrar la definición de asesinato. Dicho artículo establece que el delito de asesinato se comete cuando se le da "muerte a un ser humano **con intención de causársela**".[9] (Énfasis suplido)

La definición previa de asesinato estatutario disponía que cualquier muerte, ya sea intencional, no intencional o accidental, causada durante la comisión o tentativa de comisión de uno de los delitos graves especificados en el tipo, constituía asesinato en primer grado. **La reformulación que hizo dicho Código consistió en primer lugar, en sustituir la palabra "muerte" por "asesinato" y, en segundo lugar, añadió el elemento de consecuencia natural de la consumación o tentativa de algún delito base.**

De hecho, la frase "consecuencia natural" no es ajena a nuestro ordenamiento jurídico penal, pues, desde el Código Penal del 1974 ya se encontraba instituida dentro de su Artículo 15, el cual trataba sobre las formas de culpabilidad intencional.[10]

---

[9] 33 LPRA sec. 4733.
[10] El mencionado inciso rezaba de la manera siguiente: (b) Cuando el resultado, sin ser querido, ha sido previsto por la persona como consecuencia natural o probable de su acción y omisión.

Como vemos, es evidente que el lenguaje introducido por el Código Penal del 2004 requiere algún tipo de intención, por lo que resulta indispensable que examinemos las disposiciones del mencionado *Código* respecto a este elemento subjetivo.

En atención a ello, específicamente, el Artículo 23 del Código Penal de 2004 disponía que el delito se consideraba cometido con intención:

> a) cuando el hecho correspondiente ha sido realizado por una conducta dirigida voluntariamente a ejecutarlo;
>
> (b) el hecho correspondiente **es una consecuencia natural de la conducta voluntaria del autor**; o
>
> (c) cuando el sujeto ha querido su conducta a conciencia de que **implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado**.[11] (Énfasis suplido)

Como podemos apreciar, el elemento subjetivo de la intención está subdividido, a su vez, "en tres modalidades: propósito, conocimiento, y temeridad".[12] En lo atinente a la modalidad con propósito, esta admite que el sujeto tiene como objetivo consciente realizar el acto delictivo, o producir el hecho delictivo.[13]

Por su parte, en lo que respecta a la modalidad estatuida en el inciso (b), "se entiende que actúa con intención o dolo directo de segundo grado quien ha previsto

---

[11] 33 LPRA sec. 4651.
[12] Véase *Pueblo En Interés del Menor ESMR*, supra, pág. 811; L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, Estados Unidos, Pubs. JTS, 2007, pág. 162.
[13] Íd., pág. 144.

que la consecuencia necesaria o natural de su conducta es la realización del hecho delictivo.[14] Esta modalidad sostiene que actúa con conocimiento la persona que "haya previsto que existía una alta probabilidad de que se realizara la conducta prohibida".[15] Es decir, que la conducta voluntaria del autor "no tiene como objetivo consciente la comisión del delito", pero admite como seguro que su actuación dará lugar al delito.[16]

Finalmente, en lo que respecta a la intención del inciso (c), o como ha sido definida, la modalidad de intención por temeridad, hemos reconocido que se actúa intencionalmente de tal forma cuando se tiene conciencia de que la conducta realizada "implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado". En ese sentido, para determinar si el riesgo creado fue injustificado "es necesario tomar en consideración la magnitud del riesgo y si las razones que tenía el autor para crear el riesgo son consideradas no permitidas por la Sociedad".[17]

En *Pueblo En Interés del Menor* ESMR, supra, atendimos una controversia sobre este delito en particular. Si bien reconocimos que para que se entendiera cometido el *Felony Murder Rule* tenía que mediar intención, **nunca se estableció que ésta debía ser exclusivamente la intención directa**.

---

[14] *Pueblo En Interés del Menor* ESMR, supra, págs. 810-811; Pueblo *v. Sustache Sustache*, 176 DPR 250, 312 (2009); Chiesa Aponte, *op. cit.*, pág. 146.
[15] *Pueblo En Interés del Menor* ESMR, supra, págs. 810-811.
[16] Íd.
[17] Íd.

Todo lo contrario, reconocimos que aparte de dicho tipo, existían otras dos (2) formas de cometer un delito intencionalmente. En particular, expresamos lo siguiente:

> "**no debemos olvidar que el Código Penal de 2004 considera la "intención" como aquella que surge cuando**: (1) "el hecho correspondiente ha sido realizado por una conducta dirigida voluntariamente a ejecutarlo" (dolo de primer grado); (2) "**el hecho correspondiente es una consecuencia natural de la conducta voluntaria del autor**" (dolo de segundo grado); o (3) "**el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable** y no permitido de producir el hecho delictivo realizado". (Énfasis suplido)

Establecido lo anterior, debemos reconocer, tal cual hicimos en *Pueblo En Interés del Menor* ESMR, supra, que no existe espacio alguno para acusar por asesinato estatutario en situaciones en las cuales ocurre una muerte casual, aun cuando ésta sobrevenga mientras se comete o se intenta cometer uno de los delitos base.

En ese sentido, el asesinato, al requerir intención, no puede producirse por el azar, sino que tiene que ser como consecuencia natural de los actos del sujeto o cuando su actuación contiene un riesgo conocido y aceptado por el sujeto que decide actuar, es decir, conoce la peligrosidad objetiva de su conducta.[18] Recordemos, además, que la modalidad de intención del inciso (b) del Artículo 23 no concibe una mera probabilidad, sino una alta probabilidad del resultado.

**III.**

---

[18] Íd.

De un examen sosegado de la determinación del foro intermedio, podemos colegir que el razonamiento utilizado para revocar los veredictos de culpabilidad en controversia partió de una premisa incorrecta en derecho y contraria a lo que jurisprudencialmente hemos establecido.

Y es que, cuando el Tribunal de Apelaciones concluyó que los recurridos "*nunca tuvieron la intención de ocasionarle la muerte a un ser humano*" ya que "*[e]llos solo acordaron robar por asalto la Joyería San José*" sugieren que la única manera en que una persona puede incurrir en el delito de asesinato estatutario es si se demuestra que tuvo la **intención directa** de ocasionarle la muerte a otra persona. Es decir, que bajo la concepción del pasado código penal, solo procede el cargo si se demostraba que existió un grado de premeditación o deliberación dirigida a matar. **No puedo compartir tal apreciación por ser contraria a derecho**.

Sabido es que el Código Penal del 2004 reconoce, además de la intención directa de cometer un delito, **otros dos (2) escenarios que son igualmente válidos para demostrar el elemento subjetivo de intención, entiéndase, el dolo de segundo grado y la temeridad.** Así correctamente lo reconocimos en *Pueblo en Interés del Menor ESMR*, cuando explicamos que, en el ejercicio de interpretar la ley, no se pueden ignorar las intenciones expresas del legislador que mantuvo en el texto legislativo que el elemento mental de intención se producía, además, **como consecuencia natural**

**de los actos del sujeto o cuando su actuación contenía un riesgo conocido sobre la peligrosidad objetiva de su conducta y así conocido, decidió actuar.**

En este caso la prueba es clara y no existe controversia respecto a que los recurridos, en conjunto con otros coautores, planificaron deliberadamente cómo y de qué manera cometerían el delito de robo. El plan acordado era entrar armados a la joyería porque su dueño era un hombre de edad avanzada, de fácil manejo y dominio, y a quien amarrarían con unas correas de plástico. No obstante, cuando llegaron notaron todo lo contrario, que dicha persona estaba fuerte y saludable, por lo que tuvieron que golpearlo en el rostro para poder dominarlo y apuntarle incesantemente con el "arma" mientras se le gritaba "abre la puerta o te mato".

De hecho, previamente, al percatarse del buen estado y buena condición del señor Muñoz Aponte, sopesaron la posibilidad de abandonar el plan **aceptando la realidad fáctica de que no sería tan fácil como pensaron**. No obstante, conociendo el riesgo elevado que sus acciones conllevaban, decidieron entrar porque "ya estaban allí" **en un acto claro de desprecio y desconsideración por los previsibles resultados**, totalmente compatible, como mínimo, con el tercer elemento subjetivo de intención tipificado en el correspondiente código penal.

De lo anterior, resulta indudable que la conducta y las acciones específicas de los coautores constituyeron un

riesgo considerable bajo el cual la muerte de una persona resultaba totalmente previsible ante los ojos de cualquier ser humano razonable. Los recurridos iniciaron y pusieron en marcha una sucesión de eventos que desembocaron en la muerte de uno de ellos.

La intención por conocimiento que estatuye el Art. 23 (b) del Código Penal del 2004, *supra*, exige que la muerte suscitada **haya sido una consecuencia natural de la conducta afirmativa de los autores**.

Pero, ¿qué es una consecuencia natural? Es aquello que surge de manera inmediata después de cierto comportamiento o acción afirmativa específica, y que tiene resultado directo sobre la actuación realizada.

La lógica nos dice que el dueño de un comercio de tanto valor como lo es una joyería, evidentemente va a defender su persona, su propiedad y sus bienes en un escenario como este. Pensar lo contrario resulta en una falta de respeto a la razón y a la naturaleza humana.

Así, pues, si ignoráramos el texto claro e inequívoco del Código Penal del 2004 respecto a la intención criminal por conocimiento y temeridad, y requiriésemos solo intención directa de causar una muerte para imputar el asesinato estatutario, ¿qué propósito cumpliría, entonces, la figura del *felony murder*? Es evidente que ninguno. Estaríamos simplemente ante la modalidad de un asesinato en primer grado ordinario. La incorporación del asesinato estatuario a nuestro ordenamiento penal lo que pretende es,

precisamente, disuadir a los criminales de cometer delitos como este, los cuales conllevan un riesgo considerablemente elevado de que se suscite una muerte como consecuencia natural de sus actos violentos.

Por otro lado, es alarmante como **el Tribunal de Apelaciones minimizó el asunto en controversia** cuando concluyó que la ausencia del elemento de intención de matar "*estuvo respaldado por el interés inequívoco de los participantes del robo de adquirir un revolver de juguete*".

En primer lugar, es incuestionable el hecho de que inicialmente, los conspiradores hicieron todas las gestiones posibles para conseguir un arma de fuego real, aunque no lo lograron. En segundo lugar, en el examen que debemos realizar respecto a la peligrosidad que provocaron las acciones afirmativas de los individuos y de las posibles consecuencias naturales que de ellas emanaban, poco importaba el tipo de arma que se haya utilizado en la comisión del robo.

En el ejercicio analítico sobre esta situación, lo medular estaba circunscrito a examinar en qué forma se utilizó el arma y cuáles eran las consecuencias naturales que de dicha acción se derivaban. En el inminente peligro del momento, mientras se le apuntaba con un arma y se le amenazaba de muerte en reiteradas ocasiones, **era absurdo que la víctima se detuviera a corroborar si el arma con la cual se le agredía y amenazaba era de juguete**. La consecuencia natural de ese acto ocurrió luego de las

amenazas de muerte, el forcejeo y los golpes mutilantes, cuando el señor Muñoz Aponte logró alcanzar su arma de fuego para defender su vida, como previsiblemente haría cualquier ser humano ante lo que percibió razonablemente como una situación de amenaza directa de muerte.

Reiteramos, la prueba demostró, más allá de duda razonable, que la intención era actuar y aparentar que ostentaban un arma de fuego verdadera, de manera tal que lograran amenazar e intimidar a la víctima como parte de su plan de robo. Al actuar de esta forma, incurrieron en actos específicos e intencionales, las cuales detonaron un riesgo altamente previsible y considerable que, lógica y naturalmente, condujo a la muerte de una persona. Lo anterior no es una inferencia fáctica, **es sentido común**.

A la luz del marco fáctico demostrado, y del estado de derecho aplicable, soy del criterio que la figura del asesinato estatutario es perfectamente aplicable cuando se pueda probar que la muerte producida es una consecuencia natural de los actos afirmativos del sujeto activo. Así, y en reconocimiento de que a los recurridos les aplica la norma reconocida en *Ramos v. Lousiana*, supra, procedía celebrar un nuevo juicio contra los recurridos, permitiendo que un jurado pasara examen sobre los hechos, con el beneficio de una pauta clara de parte de este Tribunal. Es lamentable que, por estar dividida esta Curia, quede impune la muerte de un ser humano, independientemente fuese la de uno de los participantes del hecho delictivo.

Edgardo Rivera García
Juez Asociado